FILED

2021 Nov-03  AM 08:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARY ABRAMS,** as the personal representative and Administrator of the **Estate of RODERICK ABRAMS,** | } } } } | |
| **Plaintiff,** | } } | **Case No.: 2:20-cv-00011-MHH** |
| **v.** | } } | |
| **JEFFERSON DUNN, et al.,** | } | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, several of the defendants in this matter have asked the Court to dismiss Ms. Abrams's federal and state law claims against them.  Ms. Abrams's son committed suicide while in the custody of the Alabama Department of Corrections or ADOC.  Ms. Abrams has asserted a § 1983 claim against the defendants for violation of her son's constitutional right to be free from cruel and unusual punishment.  She also has asserted a wrongful death claim against the defendants under Alabama Code § 6-5-410.  The defendants who have moved to dismiss are state-level supervisory officials for ADOC and supervisory officials from the St. Clair Correctional facility where Mr. Abrams died.  The supervisory defendants contend that Ms. Abrams has not

stated a claim against them under § 1983, and, in any event, they are immune from Ms. Abrams's § 1983 claim. The supervisory defendants also contend that Ms. Abrams "fails to state a wrongful death claim against the ADOC Officials under Alabama law." (Doc. 18, p. 2, ¶ 2).[1]

To resolve the supervisory defendants' motion, the Court first sets forth the standard for motions to dismiss under Rule 12(b)(6). Then, the Court describes the factual allegations in Ms. Abrams's complaint and information incorporated into the complaint by reference. Consistent with the standard for motions to dismiss, the Court presents Ms. Abrams's factual allegations in the light most favorable to her. Then, the Court describes the circumstances under which a plaintiff may assert a § 1983 claim against supervisory officials and considers whether Ms. Abrams has alleged facts which, if proven, provide a basis for supervisory liability. The Court also considers whether Ms. Abrams has pleaded facts which, if proven, would allow her to overcome the supervisory officials' assertion that they are immune from her § 1983 claim. Finally, the Court examines Ms. Abrams's wrongful death claim under Alabama law to determine whether Ms. Abrams has stated a viable claim.

---

[1] As discussed below, the ADOC supervisory defendants are Jefferson Dunn, Ruth Naglich, Deborah Crook, Anthony Brooks, Jeff Williams, Dr. Ed Kern, Edward Ellington, Karla Jones, Warden Gwendolyn Givens, Captain Gary Malone, Captain Kevin White, and Captain Carla Graham. (Doc. 1, ¶¶ 2-15).

**I.**

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet the pleading requirement of Rule 8(a)(2) and survive a Rule 12(b)(6) challenge, a plaintiff does not have to include in a complaint "detailed factual allegations," but a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

In deciding a Rule 12(b)(6) motion to dismiss, a district court must view the factual allegations in the complaint in the light most favorable to the plaintiff and accept the alleged facts as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A district court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,* 551 U.S. at 322; *see also Brooks*

*v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim," a district court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal . . .").

## II.

Ms. Abrams's claims against the supervisory officials derive from *Braggs v. Dunn*, a complex prisoner class action that has been litigated for several years before the Honorable Myron Thompson in the United States District Court for the Middle District of Alabama. *Braggs v. Dunn*, 2:14-cv-60-MHT. Among other things, the *Braggs* case involves a plaintiff class of "persons with a serious mental illness" who are confined in ADOC facilities. That plaintiff class seeks injunctive and declaratory relief from "constitutionally inadequate mental-health care in [Alabama] prison facilities." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1180 (M.D. Ala. 2017). The prisoners in *Braggs* sued ADOC Commissioner Jefferson Dunn and ADOC Associate Commissioner of Health Services Ruth Naglich in their official capacities. *Braggs*, 257 F. Supp. 3d at 1180. Both are supervisory defendants in Ms. Abrams's lawsuit.[2]

---

[2] In March 2021, Deborah Crook was substituted as Interim Associate Commissioner for Associate Commissioner Naglich when Ms. Naglich retired.

Ms. Abrams alleges that each defendant in this case either is one of the "defendants, or [is] in privity to the defendants, in *Bragg*[*s*] . . . ." (Doc. 1, pp. 8-9, ¶ 29). In addition to Commissioner Dunn and Associate Commissioner Naglich, Ms. Abrams has named as defendants Deborah Crook, ADOC's Director of Mental Health Services between 2017 and 2019, (Doc. 1, pp. 2-3, ¶ 6); Jeff Williams, an ADOC Deputy Commissioner who allegedly "had directed that inmates not generally be released from suicide watch to segregation," (Doc. 1, p. 3, ¶ 10); Ed Kern, ADOC's Psychiatry Director who allegedly "was responsible for overseeing inmates' psychiatric care," (Doc. 1, p. 4, ¶ 11); Edward Ellington, "ADOC's regional Correctional Institutional Coordinator for the Northern portion" of Alabama, (Doc. 1, p. 4, ¶ 12); and St. Clair Correctional Facility Wardens Brooks, Givens, and Jones and Captains Malone, White, and Graham, (Doc. 1, ¶¶ 7, 8, 9, 13, 14, 15, 30). Ms. Abrams has sued these 11 supervisory defendants in their individual capacities. (Doc. 1, ¶¶ 2-15).[3]

In her complaint, Ms. Abrams alleges that her son, Roderick Abrams, was an ADOC inmate who should have been protected by an "interim suicide prevention agreement" that the parties in *Braggs v. Dunn* negotiated. (Doc. 1, pp. 6-7, ¶¶ 23-24; MDAL Case 2:14-cv-601-MHT, Doc. 1106). By order dated January 13, 2017,

---

[3] In addition to the 11 supervisory defendants, Ms. Abrams has named as defendants four ADOC correctional officers, Wexford Health Sources, Inc., and Wexford's Program Director for Mental Health. (Doc. 1, ¶¶ 16-21).

Judge Thompson approved the *Braggs* parties' "Interim Agreement Regarding Suicide Prevention Measures" and instructed the *Braggs* defendants to "comply with the agreement until the court enters a final order in Phase 2A of this case." (MDAL Case 2:14-cv-601-MHT, Doc. 1106, p. 1).[4]  Ms. Abrams alleges that Commissioner Dunn, Associate Commissioner Naglich, Director Crook, and the other state-level supervisory defendants "were responsible for implementing the [suicide prevention] agreement in all ADOC facilities, including St. Clair." (Doc. 1, p. 9, ¶ 30).  Ms. Abrams alleges that St. Clair Correctional Facility Wardens Brooks, Givens, and Jones and Captains Malone and White "were specifically responsible for implementing" the interim suicide-prevention agreement at the St. Clair Correctional Facility. (Doc. 1, ¶¶ 7, 8, 9, 13, 14, 30).  Ms. Abrams alleges that the supervisory defendants' failure to properly implement the *Braggs* interim suicide prevention agreement and those defendants' deliberate indifference to the "known danger of

---

[4] Judge Thompson's January 13, 2017 order and the attached "Interim Agreement Regarding Suicide Prevention Measures" appear as Attachment 1 to this opinion.  The Court takes judicial notice of Judge Thompson's January 13, 2017 order. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999) ("Fed.R.Evid. 201(b) provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. When SEC documents are relevant only to determine what statements or disclosures are actually contained therein, there can be little question as to authenticity, nor can the fact that such statements or disclosures were thus publicly filed be reasonably questioned."); *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. Appx. 52, 53-54 (11th Cir. 2006) (holding that a "district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. Public records are among the permissible facts that a district court may consider.") (citations omitted).
.

suicide" led to her son's January 2, 2019 suicide at the St. Clair Correctional Facility. (Doc. 1, p. 9, ¶ 30).

More than one year before Mr. Abrams committed suicide, Judge Thompson issued findings of facts and conclusions of law in *Braggs*. 257 F. Supp. 3d at 1180. Judge Thompson found that Commissioner Dunn and Associate Commissioner Naglich, in their official capacities, were "violating the Eighth Amendment rights of the plaintiff class." *Braggs*, 257 F. Supp. 3d at 1267. Judge Thompson held that "ADOC's mental-health care is horrendously inadequate." *Braggs*, 257 F. Supp. 3d at 1267. Among other things, Judge Thompson concluded that ADOC failed "to identify prisoners with serious mental-health needs," failed "to provide psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality," failed "to identify suicide risks adequately" and failed to provide adequate "treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis." *Braggs*, 257 F. Supp. 3d at 1267-68. Judge Thompson also found that ADOC placed prisoners "with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health" or adequate monitoring in segregation. *Braggs*, 257 F. Supp. 3d at 1268. Judge Thompson specifically found deficiencies at the St. Clair Correctional Facility, *see, e.g.*, *Braggs*, 257 F. Supp. 3d at 1226, 1227, and 1239. Judge Thompson stated that "Associate

Commissioner Naglich [] and other officials readily admitted to the existence of serious deficiencies [in ADOC facilities], the risk of harm arising from them, and ADOC's failure to respond," and their "admissions of knowledge and failure to act" supported his finding of institutional deliberate indifference. *Braggs*, 257 F. Supp. 3d at 1252.

At the conclusion of his June 27, 2017 order, Judge Thompson instructed the *Braggs* parties to meet with the Court to discuss a remedy, and he explained that no final judgment on the plaintiffs' Eighth Amendment claim for inadequate mental-health care would be issued at that time. *Braggs*, 257 F. Supp. 3d at 1268. Consequently, per Judge Thomson's January 13, 2017 order, the *Braggs* defendants' obligation to comply with the parties' "Interim Agreement Regarding Suicide Prevention Measures" was not displaced by Judge Thompson's June 2017 decision. When Mr. Abrams committed suicide at the St. Clair Correctional Facility in January of 2019, the *Braggs* defendants still were obligated to comply with the *Braggs* suicide prevention agreement.

The *Braggs* interim suicide-prevention agreement, as it relates to Ms. Abrams's claims, provides:

> The Alabama Department of Corrections shall implement the following measures in a timely and prompt manner prior to the agreed upon assessor or monitor, which will be the subject of continuing discussions among Commissioner Dunn, Associate Commissioner Naglich, the Plaintiff Class and Alabama Disabilities Advocacy Program (collectively 'the Parties'). The below measures will be reassessed

upon completion of the assessor/monitor's assessment and may be modified with the agreement of the parties at the time.

1. Licensed Mental Health Professionals ("MHPs") will be hired for the mental health program in ADOC. Each Major Facility will have at least one full time (1 FTE) licensed MHP, and the treatment hubs—Bullock, Donaldson, and Tutwiler—will have at least two (2 FTEs) licensed MHPs. There will be two (2) licensed MHPs on site for at least 8 hours per day every business day at each treatment hub.

    …

5. Any person who is determined to be acutely suicidal shall be monitored through a constant watch procedure.

6. Any person who is determined to be nonacutely suicidal shall be monitored through a close watch procedure that ensures monitoring by ADOC staff at staggered intervals not to exceed every 15 minutes.

7. Both constant watch and close watch shall be contemporaneously documented at staggered intervals not to exceed 15 minutes on a record maintained on each individual cell door. Upon discharge from suicide watch, these records will be maintained in a facility-based suicide watch log and in the individual prisoner's medical record.

8. ADOC Administrative Regulation 630, which currently mandates 15-minute intervals for monitoring on suicide watch will be revised to reflect the constant watch process and the staggered 15-minute monitoring for persons deemed nonacutely suicidal.

    …

10. A person may be discharged from suicide watch following an out of cell, confidential evaluation according to the following terms.

    …

9

f. Each patient placed on constant watch will be reduced to a close watch prior to release from suicide watch.

11. Upon release from suicide watch, each person will have at least three follow-up examinations by mental health staff. The first follow-up examination will occur within three calendar days of the release from suicide watch. The second follow-up examination will occur within seven calendar days of the release from suicide watch. The third follow-up examination will occur within 30 days of the release. The first two follow-ups will occur within the stated timeframe, regardless of the day of the week. If 30 days from release falls on a weekend, the 30-day follow-up can take place during the following work week.

a. The follow-up examinations described in paragraph 10 will be conducted out of cell and in a confidential setting. The follow-up examinations do not take the place of otherwise scheduled mental health appointments, though they may occur in connection with or contiguous with such appointments. The mental health staff conducting the follow-up examinations shall assess whether the person released from suicide watch is showing signs of on-going crisis, whether the person needs further follow-up examinations, and whether the person should be added to the mental health caseload or assigned a different mental health code.

…

12. ADOC leadership at the warden level or higher shall issue an order by January 11, 2017 at the latest that mental health staff, including contract mental health staff and ADOC psychologists or psychological associates, conduct mental health rounds or

Segregation Board rounds at least five times each week as required by Admin. Reg. 624.

13. Mental health staff conducting mental health rounds for suicide watch shall contemporaneously document rounds on each individual cell door. Upon discharge from the unit, these records will be maintained in a facility-based mental health rounds log and in the individual prisoner's medical record.

(Attachment 1, *Braggs v. Dunn*, 2:14-cv-60-MHT, Doc. 1106-1, pp. 1-4).

Ms. Abrams alleges that the supervisory defendants "individually and collectively, failed to implement the agreement despite knowing of the dangers of not doing so and the imperative that it be implemented." (Doc. 1, p. 9, ¶ 30). Ms. Abrams states that facts that Judge Thompson found in an opinion that he issued on May 4, 2019 in *Braggs* accurately reflect the circumstances surrounding Mr. Abrams's suicide, and she adopts those findings as her factual allegations in this case. (Doc. 1, p. 8, ¶ 28). Accordingly, Ms. Abrams alleges that her son committed suicide "the same day he was placed in segregation." (Doc. 1, p. 7, ¶ 25; MDAL Case 2:14-cv-601-MHT, Doc. 2525); *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1232 (M.D. Ala. 2019). Ms. Abrams alleges that ADOC failed to place her son on suicide watch "when he expressed suicidality, repeatedly fail[ed] to screen him for mental-health issues prior to placing him in segregation," and failed "to immediately initiate life-saving measures" when ADOC staff found her son hanging in his cell. (Doc. 1, p. 7, ¶ 25); *Braggs*, 383 F. Supp. at 1232-33. Ms. Abrams alleges that a "nursing

record from September 3 reported that [Mr.] Abrams had suicidal thoughts and had told people he was going to hang himself.  Despite being suicidal, [Mr.] Abrams remained in segregation instead of being placed on suicide watch and did not receive a suicide risk assessment at that point." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).   According to Ms. Abrams, "[r]ecords indicate that, while in segregation, space and security staff shortages prevented [Mr.] Abrams from having his scheduled mental-health appointments on November 20, 27, and 30, and December 4" of 2018.  (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).

Ms. Abrams alleges that on December 21, 2018, Mr. Abrams "was placed on suicide watch after stating that he was suicidal." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).  A mental-health progress note from December 26, 2018 indicates that Mr. Abrams "reported that he had safety concerns and wanted to change institutions because of a conflict he had with gang-affiliated inmates due to his sexuality. His records do not contain a single crisis treatment plan." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).[5]

---

[5] Ms. Abrams asserts that the factual findings described in this paragraph "accurately reflect what happened" to Mr. Abrams.  (Doc. 1, p. 8, ⁋ 28).  Ms. Abrams adopts these factual findings as her own factual allegations.  (Doc. 1, p. 8, ⁋ 28).

Ms. Abrams alleges that Mr. Abrams "was released from suicide watch on December 26," 2018 and, "sometime between then and January 2, he was placed in segregation." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).  ADOC records indicate that Mr. Abrams "did not receive a segregation preplacement screening.  Nor did he receive a three-day follow-up after being discharged from suicide watch." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs evidentiary* record cites omitted).  Though ADOC officials placed Mr. Abrams on suicide watch, "he was not placed on the mental-health caseload." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs* evidentiary record cites omitted).[6]

Ms. Abrams alleges that ADOC's "segregation duty post logs" from the St. Clair County Jail "indicate that, during the week running up to his suicide, there were several times where there was an hour, or even two hours, between security checks, even though ADOC policy requires that security checks in segregation be conducted every 30 minutes." (Doc. 1, pp. 7-8, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs* evidentiary record cites omitted).  "On January 2, 2019, at approximately 7:00 p.m., more than an hour after the last security check, a correctional officer making a security check discovered [Mr.] Abrams hanging from a vent cover inside

---

[6] Ms. Abrams asserts that the factual findings described in this paragraph "accurately reflect what happened" to Mr. Abrams.  (Doc. 1, p. 8, ⁋ 28).  Ms. Abrams adopts these factual findings as her own factual allegations.  (Doc. 1, p. 8, ⁋ 28).

his cell." (Doc. 1, p. 8, ℙ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs* evidentiary record cites omitted).[7] "At 7:11 [p].m., [Mr. Abrams] was cut down and medical staff initiated CPR, according to one officer's report. According to [two experts in *Braggs*], this emergency response time was 'inadequate to save life,' as '11 minutes from discovery to cut down is more than enough time for death to occur.'" (Doc. 1, p. 8, ℙ 25); *Braggs*, 383 F. Supp. at 1233-34 (*Braggs* evidentiary record cites omitted).[8]

Ms. Abrams contends that the supervisory defendants violated Mr. Abrams's Eighth and Fourteenth Amendment rights when they failed to properly treat his mental health condition and failed to implement the interim suicide prevention agreement, and she alleges that that failure proximately caused her son's suicide. (Doc. 1, pp. 6-7, ¶ 24; Doc. 1, p. 10, ¶ 36). She alleges that the supervisory defendants' deliberate indifference to Mr. Abrams's "increasingly serious mental health deficits," failure to adequately treat Mr. Abrams, failure to "properly train and/or supervise correctional officers," and "failure to adequately and timely

---

[7] To this point, Ms. Abrams asserts that the factual findings described in this paragraph "accurately reflect what happened" to Mr. Abrams. (Doc. 1, p. 8, ℙ 28). Ms. Abrams adopts these factual findings as her own factual allegations. (Doc. 1, p. 8, ℙ 28).

[8] Ms. Abrams asserts that "it may have taken more than eleven minutes from [Mr.] Abrams being discovered to being cut down." (Doc. 1, p. 8, ℙ 28). Ms. Abrams adopts Judge Thompson's finding that "eleven minutes from discovery to cut down is more than enough time for death to occur." (Doc. 1, p. 8, ℙ 28).

Ms. Abrams alleges that Correctional Officers Thompkins and Luitze "discovered [Mr.] Abrams in his cell" and "failed to cut him down for at least eleven minutes." (Doc. 1, p. 10, ℙ 34).

respond when [Mr.] Abrams was discovered hanging in his cell" created an excessive risk to Mr. Abrams's health and wellbeing, contributing to his death. (Doc. 1, p. 11, ¶¶ 37–41).

## III.

## A.

The supervisory defendants argue that the Court should dismiss Ms. Abrams's claims against them because their status as supervisory officials insulates them from liability for Mr. Abrams's suicide. (Doc. 19, pp. 13-16). On the record before it, the Court disagrees. The defendants point out that "'supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'" (Doc. 19, p. 13) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)) (in turn quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). That proposition is accurate as far as it goes, but supervisory defendants may be liable when their independent conduct is alleged to have caused a plaintiff's injuries. *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir. 1990). Ms. Abrams does not allege that the supervisory defendants were distant observers who played no role in Mr. Abrams's suicide, such that the only basis for the supervisory defendants' potential liability in this case rests on the principle of *respondeat superior* or vicarious liability. Rather, Ms. Abrams alleges that the supervisory defendants failed to fulfill their obligations to implement the *Braggs*

"Interim Agreement Regarding Suicide Prevention Measures" and that the defendants' alleged failure to fulfill their own duties caused her son's suicide.

This alleged failure by the supervisory defendants provides a basis for a § 1983 claim against them based on their conduct, not the conduct of the correctional officers who they supervise. As the Eleventh Circuit recently explained,

> [t]here are three ways to establish a causal connection between a supervisor's actions and the unlawful conduct: 1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; 2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or 3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

*Dickinson v. Cochran*, 833 Fed. Appx. 268, 272 (11th Cir. 2020) (quoting *Cottone*, 326 F.3d at 1360); *see also Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003). The supervisory defendants' alleged failure to implement the *Braggs* interim suicide prevention agreement per Judge Thompson's January 2017 order left in place in January 2019 ADOC policies that allegedly were deliberately indifferent to the welfare of suicidal prisoners.[9]   Because the supervisory defendants allegedly disobeyed Judge Thompson's 2017 order, ignored their obligations under the *Braggs*

_____

[9] The supervisory defendants argue that Judge Thompson entered the suicide prevention agreement as a remedy following his findings of institutional constitutional violations in May of 2019. (Doc. 19, p. 16). In fact, in 2019, Judge Thompson made the *Bragg* parties' interim agreement permanent, but he first ordered the *Braggs* defendants "to comply" with the interim suicide prevention agreement in January of 2017.

suicide prevention agreement, and allowed ADOC's deficient mental health policies to remain in place, the supervisory defendants allegedly knew that their subordinates would act unlawfully under ADOC's deficient mental health policies, but the supervisory defendants did not stop their subordinate officers by fully implementing the *Braggs* suicide prevention agreement.[10]

Ms. Abrams alleges that her son committed suicide the day he was placed in segregation because, 18 months after Judge Thompson found that ADOC's mental health policies were woefully inadequate, the supervisory defendants still had not properly implemented the January 2017 suicide prevention agreement at the St. Clair Correctional Facility.  Thus, Ms. Abrams has adequately alleged facts to support a claim for supervisory liability against the supervisory defendants.

## B.

Ms. Abrams's factual allegations also suffice to overcome the defense of qualified immunity as to most of the supervisory defendants.  "The defense of

---

[10] When Mr. Abrams died in January 2019, the supervisory defendants not only were under court order to implement the provisions of the *Braggs* interim suicide-prevention agreement, but the supervisory defendants also had notice of Judge Thompson's findings that Commissioner Dunn and Associate Commissioner Naglich, in their official capacities, were "violating the Eighth Amendment rights of the [*Braggs* mental health] plaintiff class."  257 F. Supp. 3d at 1267.

The Court does not adopt Judge Thompson's factual findings as its own.  *See Grayson v. Warden, Commissioner, ADOC*, 869 F.3d 1204, 1224-25 (11th Cir. 2017) (explaining that a court may not use judicial notice to adopt as findings in the case before it findings in another action).  The Court takes notice of the fact that Judge Thompson had issued an opinion in which he found that the conduct of defendants Dunn, Naglich, and Crook was constitutionally deficient, giving the supervisory defendants notice of those findings more than one year before Mr. Abrams committed suicide.

qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez*, 325 F.3d at 1233 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Qualified immunity 'does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Carter v. Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (quoting *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003)).

Courts use a burden-shifting process to evaluate the defense of qualified immunity. An official who asserts the defense first must establish that he was acting within the scope of his discretionary authority at the time of the alleged constitutional infraction. *Carter*, 821 F.3d at 1319. If an official makes that showing, then the burden shifts to the plaintiff. To avoid the defense, a plaintiff must "establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." *Carter*, 821 F.3d at 1319. Ms. Abrams concedes that the supervisory officials were acting within the scope of their discretionary authority, so to survive the supervisory officials' motion to dismiss, she must adequately allege that the supervisory officials violated a constitutional right that belonged to Mr. Abrams and that the right was

clearly established when the alleged violation occurred.  The right at issue here is the Eighth Amendment right to be free from cruel and unusual punishment.

"It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment [only] if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Dickinson*, 833 Fed. Appx. at 271 (quoting *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019)) (quotations omitted) (alteration in *Dickinson*). "Deliberate indifference, in the context of a jail suicide case, is a question of whether a defendant was deliberately indifferent to an individual's mental condition and the likely consequences of that condition." *Tittle v. Jefferson County Com'n*, 10 F.3d 1535, 1539 (11th Cir. 1994) (citing *Wright v. Wagner*, 641 F.2d 239, 242 (5th Cir. Unit A March 1981)).

"In the context of jail suicides, an allegation of deliberate indifference must be considered in light of the level of knowledge possessed by the officials involved, or that which should have been known as to an inmate's suicidal tendencies." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990).  Under Eleventh Circuit precedent, to establish deliberate indifference in a prison suicide case, a plaintiff must demonstrate that an official has "notice of the suicidal tendency of *the* individual whose rights are at issue" and that the official deliberately disregarded a

"'strong likelihood, rather than a mere possibility,' that suicide would result from [an official's] actions or inaction." *Tittle*, 10 F.3d at 1539-40 (citing *Popham*, 908 F.2d at 1564) and quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir. 1989)) (emphasis in *Tittle*). Prison officials "cannot be liable under § 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." *Tittle*, 10 F.3d at 1540 (citations and quotations omitted). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Tittle*, 10 F.3d at 1540 (citing *Popham*, 908 F.2d at 1564).

Ms. Abrams sufficiently alleges that Mr. Abrams threatened suicide and was a suicide risk. She alleges that in September of 2018, Mr. Abrams reported that he had suicidal thoughts, and he told people at the St. Clair Correctional Facility that he was going to hang himself. This is more than a "mere opportunity for suicide." *Tittle*, 10 F.3d at 1540. "Despite being suicidal, [Mr.] Abrams remained in segregation instead of being placed on suicide watch and did not receive a suicide risk assessment at that point." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs* evidentiary record cites omitted). According to Ms. Abrams, "[r]ecords indicate that, while in segregation, space and security staff shortages prevented [Mr.] Abrams from having his scheduled mental-health appointments on November 20, 27, and 30, and December 4" of 2018. (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at

1233 (*Braggs* evidentiary record cites omitted). On December 21, 2018, Mr. Abrams "was placed on suicide watch after stating that he was suicidal." (Doc. 1, p. 7, ⁋ 25); *Braggs*, 383 F. Supp. at 1233 (*Braggs* evidentiary record cites omitted). He was released from suicide watch on December 26, 2018, and he did not receive a three-day follow-up per the *Braggs* agreement, and he was not placed on the correctional facility's "mental health caseload." (Doc. 1, p. 7, ⁋ 25; *Braggs v. Dunn*, 2:14-cv-601-MHT, Doc. 1106-1, p. 3, ⁋ 11). Mr. Abrams killed himself one week after his release from suicide watch while he was in segregation.

Ms. Abrams alleges that St. Clair County Correctional Facility Wardens Brooks, Givens, and Jones and Captains Malone, White, and Graham were responsible for implementing the *Braggs* suicide prevention agreement at the facility and that the local supervisory defendants failed to implement that agreement "despite knowing the dangers of not doing so." (Doc. 1, p. 9, ⁋ 30). She contends that their deliberate indifference to the known danger of suicide led to Mr. Abrams's suicide. At this stage of the litigation, Ms. Abrams' has alleged sufficient facts to establish a constitutional violation against the local supervisory defendants. If she can prove that those defendants had responsibility for implementing the *Braggs* agreement at the St. Clair ADOC facility and failed to do so knowing that suicide likely would result for an inmate who was at risk because of grossly inadequate

ADOC mental health policies, then she may be able to prove a constitutional violation against the local supervisory defendants.

The same is true of state-level supervisory defendants Dunn and Naglich. Because of their involvement in the *Braggs* litigation, their direct role in negotiating the *Braggs* suicide prevention agreement, their obligation to implement that agreement pursuant to Judge Thompson's January 2017 order, and their notice of Judge Thompson's June 2017 factual findings concerning the deficiencies in ADOC's mental health policies generally and the St. Clair facility in particular, these state-level supervisory officials allegedly disregarded a "strong likelihood" that Mr. Abrams (and others like him at the St. Clair facility) would succeed in killing himself because of these defendants' purported inaction.  Ms. Abrams asserts that, because of their alleged failure to implement the *Braggs* suicide prevention agreement, the supervisory defendants deprived Mr. Abrams of proper screening and medication and exacerbated his condition by keeping him in segregation and this led to Mr. Abrams killing himself.  These allegations extend to ADOC Director of Mental Health Services Crook who allegedly was responsible for "insuring that inmates with mental health issues were properly cared for.  A critical part of her duties was suicide prevention." (Doc. 1, pp. 2-3, ⁋ 6).

Ms. Abrams has not alleged sufficient facts to establish a constitutional violation by supervisory defendants Williams, Kern, and Ellington.  Ms. Abrams has

not explained the roles these defendants played in the implementation of the *Braggs* suicide prevention agreement, and the Court has not found information in the *Braggs* orders that would provide a basis for an Eighth Amendment claim against these three supervisory defendants.  (*See* Doc. 1, p. 3, ¶ 10; Doc. 1, p. 4, ¶ 11; Doc. 1, p. 4, ¶ 12). Therefore, the Court will dismiss Ms. Abrams's claims against Mr. Williams, Mr. Kern, and Mr. Ellington without prejudice.[11]

The supervisory officials argue that Ms. Abrams has not adequately alleged that each of them "actually knew of the likelihood that Abrams would commit suicide or that he did not receive appropriate care for his mental health needs."  (Doc. 43, pp. 5-6).  The officials contend that "awareness of the *system-wide* matters addressed in the *Braggs* Action does not equate to knowledge of 'widespread' constitutional deprivations *at St. Clair* of the same type which allegedly led to [Mr.] Abrams's death."  (Doc. 43, p. 8) (emphasis in the officials' brief).  Quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092 (11th Cir. 2005), the supervisory officials assert that "[d]eliberate indifference . . . is not a question of the defendant's indifference to suicidal inmates or suicide indicators *generally*, but rather it is a question of whether a defendant was deliberately

---

[11] Every supervisory defendant asserts the defense of qualified immunity to Ms. Abrams's claims. Ms. Abrams argues that none of the supervisory defendants is entitled to immunity.  The Court has evaluated the claim of immunity separately for each supervisory defendant. *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

indifferent to an *individual's mental condition* and the likely consequences of that condition."  (Doc. 43, p. 8) (quoting *Cook*, 402 F.3d at 1117) (emphasis in the officials' brief).

The quote from *Cook* on which the supervisory defendants rely is accurate, but context is important.  In *Cook*, the plaintiff sued a sheriff in his official capacity after the plaintiff's partner committed suicide in a county detention center.  *Cook*, 402 F.3d at 1100-02.  The plaintiff asserted several claims against the sheriff, including a § 1983 claim for deliberate indifference.  *Cook*, 402 F.3d at 1100.  After a trial on the merits, the district court entered judgment as a matter of law in favor of the sheriff, and the plaintiff appealed.  *Cook*, 402 F.3d at 1100.  The Eleventh Circuit affirmed the judgment for the sheriff on the § 1983 claim.  *Cook*, 402 F.3d at 1100.  The Court of Appeals noted that the claim against the sheriff in his official capacity effectively was a claim against the county.  *Cook*, 402 F.3d at 1115.  As a result, to avoid the sheriff's motion for judgment as a matter of law, the plaintiff had "to establish that the *County* should have foreseen [the prisoner's] suicide . . ." *Cook*, 402 F.3d at 1116 (emphasis in *Cook*).  The Court of Appeals found the record "utterly devoid" of evidence suggesting that the sheriff had subjective knowledge of a strong likelihood of self-harm.  *Cook*, 402 F.3d at 1116.  The Eleventh Circuit held that the plaintiff could not prove the sheriff's subjective knowledge by establishing deliberate indifference to a class of prisoners to which the decedent belonged, and

24

even if the option were available, the plaintiff had offered no evidence that the sheriff was generally indifferent to suicidal tendencies in prisoners or that the decedent's suicide somehow was foreseeable to the sheriff. *Cook*, 402 F.3d at 1117. Thus, *Cook* was decided on a full evidentiary record that contained no evidence that indicated that the decedent's suicide was foreseeable to the sheriff and the county that he served.[12]

The record here is different. This case is before the Court on a motion to dismiss. The complaint that the supervisory defendants challenge concerns the alleged failure of Commissioner Dunn and Associate Commissioner Naglich – state-level ADOC supervisory officials – to abide by an agreement pursuant to which they were obligated to correct deficiencies in ADOC policies and procedures that made, in Judge Thompson's words, ADOC's mental-health program "horrendously inadequate." 257 F. Supp. 3d at 1267. At the time of Mr. Abrams's suicide,

---

[12] *Tittle* also involved a § 1983 claim against a county and was decided on an evidentiary record. *Tittle*, 10 F.3d at 1539-40. In *Tittle*, the record was "silent on the question of whether any County representative knew, prior to Harrell's suicide, about any of the suicide attempts or suicides." *Tittle*, 10 F.3d at 1538.

In *Keith v. Naglich*, no. 5:17-cv-01437-AKK, 2018 WL 513344 (N.D. Ala. Jan. 23, 2018), the district court dismissed a deliberate indifference claim against Associate Commissioner Naglich relating to the suicide of an ADOC prisoner in 2015, well before the Associate Commissioner became a party to the *Braggs* suicide prevention agreement and subject to Judge Thompson's order to implement the terms of the suicide prevention agreement. 2018 WL 513344 at *2. Thus, the district court's finding that "none of the generalized factual allegations attacking the overall level of mental health care provided by the ADOC have any bearing on the adequacy of the medical decisions related to the removal of Mr. Hammonds from the mental health caseload in 2008," seven years before his suicide, does not translate to the record in this case. *Keith*, 2018 WL 513344 at *4.

Commissioner Dunn, Associate Commissioner Naglich, and Director Crook were on notice that Judge Thompson had found that ADOC provided "inadequate treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis," and placed prisoners "with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health" or adequate monitoring in segregation. 257 F. Supp. 3d at 1267-68. Judge Thompson specifically found deficiencies at the St. Clair Correctional Facility, *see, e.g.*, 257 F. Supp. 3d at 1226, 1227, and 1239, and ordered Commissioner Dunn and Associate Commissioner Naglich to comply with the interim suicide prevention agreement in *Braggs*.[13]

Accepting as true and viewing in the light most favorable to Ms. Abrams the factual allegations in the *Abrams* complaint and the terms of the *Braggs* suicide prevention agreement and taking judicial notice of Judge Thompson's January 2017 order directing the *Braggs* defendants to implement the *Braggs* suicide prevention agreement, Ms. Abrams has alleged facts sufficient to establish an Eighth

---

[13] The supervisory defendants argue that Ms. Abrams has not alleged "facts demonstrating a 'widespread abuse' at St. Clair alerting Commissioner Dunn of the need for corrective action to revise a policy, custom, or practice." (Doc. 43, p. 9). Commissioner Dunn did not have to wait to receive notice of specific instances of abuse at the St. Clair facility before revising ADOC's mental health policy because he was under a court order to do so at the St. Clair facility and at "all ADOC facilities except any designated community based facility ("work release") or community work center." (MDAL Case 2:14-cv-601-MHT, Doc. 1106-1, p. 1 n. 2). Nevertheless, Judge Thompson's June 2017 findings of fact in *Braggs* put Commissioner Dunn on notice of deficiencies in mental health care at the St. Clair facility.

Amendment violation against all supervisory defendants other than Mr. Williams, Mr. Kern, and Mr. Ellington because she has alleged facts that made Mr. Abrams's suicide foreseeable to the supervisory defendants.

Mr. Abrams's right to be free from prison officials' deliberate indifference to his need for adequate mental health policies and mental health care was clearly established when he committed suicide in the St. Clair Correctional Facility in January of 2019. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Dickinson*, 833 Fed. Appx. at 273 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Essentially, "'the state of the law' at the time of the officials' conduct" must give the officials "fair warning that their alleged treatment of the plaintiff was unconstitutional." *Dickinson*, 833 Fed. Appx. at 273 (quoting *Hope*, 536 U.S. at 741). To demonstrate that a right is clearly established, a plaintiff may point to a "materially similar case," identify "a broader, clearly established principle" that should control, or show that the facts of the instant case "so obviously violate[] the constitution that prior case law is unnecessary." *Dickinson*, 833 Fed. Appx. at 273-74 (citations omitted). The supervisory defendants argue that Ms. Abrams has not pointed to "prior case law" from the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Alabama Supreme Court that would have placed the supervisory officials on notice that their

27

conduct violated the constitution.  (Doc. 43, p. 11).  Ms. Abrams acknowledges the point.  The Eleventh Circuit's decision in *Greason v. Kemp* provides adequate notice to the supervisory defendants that, on the facts alleged in this case, they could be held liable for Mr. Abrams's suicide.

In *Greason*, the Eleventh Circuit explained that Supreme Court precedent concerning an inmate's constitutional right to health care extended to mental health care.  The Court of Appeals stated:

> To decide whether, at the time of Greason's suicide, prisoners had a clearly established constitutional right to psychiatric care, we look to the law established by the Supreme Court, the courts of appeals, and the district courts. *See Harlow,* 457 U.S. at 819 n. 32, 102 S.Ct. at 2738 n. 32. We begin with *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which was decided by the Supreme Court nearly a decade before the events in this case took place. In *Estelle,* the Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). Because *Estelle* involved the provision of medical care rather than psychiatric care, however, the appellants in the present case argue that reasonable persons occupying their roles in a state prison system would not have known that *Estelle* condemned the type of conduct appellees complain of here.

The district court, in rejecting appellants' argument, stated:

> From a strictly pragmatic perspective, the line separating traditional medical care from psychiatric treatment is blurred indeed, particularly in cases, such as the instant one, when psychotropic drugs are prescribed. Both a medical doctor practicing medicine and a medical doctor practicing psychiatry, such as Dr. Fodor, can prescribe these drugs, and the mere fact that a drug is prescribed by one as opposed to the other should not alone characterize the nature of the treatment for Eighth

Amendment purposes. Certainly any reasonably competent prison counselor or administrator, would realize that denying a prisoner needed psychotropic drugs might trigger liability under *Estelle*—just as any physician who declined to treat a gangrenous infection with antibiotics might reasonably expect a constitutional challenge. Even if this case involved failure to provide psychotherapy or psychological counselling alone, the court would still conclude that the psychiatric care was sufficiently similar to medical treatment to bring it within the embrace of *Estelle*.

This rationale has been used by other courts in disposing of cases involving the delivery of mental health care to prison inmates. In fact, every reported decision handed down after *Estelle* and before the events in this case occurred—i.e., the decisions that would have informed persons in appellants' positions as to the state of the relevant law—recognized that deliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir.1977). We accordingly hold that, at the time of Greason's suicide, reasonable persons in appellants' positions would have known that providing an inmate with inadequate psychiatric care could violate the inmate's eighth amendment right not to be subjected to cruel and unusual punishment.

*Greason*, 891 F.2d at 833-34.

Having found that prisoners had a clearly established constitutional right to adequate psychiatric care at the time of Mr. Greason's suicide, the Eleventh Circuit turned its attention to the question of whether each defendant had notice that he might be subject to liability for Mr. Greason's allegedly inadequate psychiatric care

while he was in prison.  The Eleventh Circuit identified two groups of defendants: "The first group consist[ed] of those who were directly responsible for Greason's psychiatric care—Dr. Fodor and Calvin Brown; the second group consist[ed] of those who were responsible for supervising them—Dr. Oliver, Dr. Duncan, and Warden Kemp." *Greason*, 891 F.2d at 835.  The Eleventh Circuit held that the first group had sufficient notice of their potential liability, stating:  "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason*, 891 F.2d at 835-36.

With respect to the supervisory defendants, the Eleventh Circuit began by noting that "[t]he determination of whether a supervisor was deliberately indifferent and whether that indifference was causally related to the constitutional violation is a fact-sensitive inquiry." *Greason*, 891 F.2d at 837 (citation omitted).  Therefore, the Court of Appeals examined the evidence concerning each of the three supervisory defendants to determine whether each was entitled to summary judgment based on qualified immunity.  The Court of Appeals held that a jury could conclude that Dr. Oliver, the defendant responsible for medical and mental health care for all residents of the facility where Mr. Greason killed himself, was deliberately indifferent to Mr. Greason's right to adequate psychiatric care because he had notice of "the severe

30

lack of staff members capable of providing psychiatric care to the inmates," and he did nothing to address the inadequate staffing. *Greason*, 891 F.2d at 837. The Eleventh Circuit stated: "We have held that when understaffing appears to have contributed to a violation of an inmate's eighth amendment rights, a causal link exists between that violation and the city's policy if officials are aware of the staffing problem but fail to take corrective action." *Greason*, 891 F.2d at 838 (citing *Anderson v. City of Atlanta,* 778 F.2d 678, 685–86 & n.11 (11th Cir. 1985)).

Supervisory defendant Duncan, "at the time of Greason's suicide, held the position of director of mental health for the Georgia Department of Corrections. As mental health director, Duncan was responsible for ensuring that all mental health programs were properly implemented at all institutions, including the GDCC." *Greason*, 891 F.2d at 839. The summary judgment evidence demonstrated that Dr. Duncan "was aware of many conditions at the GDCC that could lead to grossly inadequate mental health care. Duncan knew, for example, that many of the inmates did not receive enough recreation time, and he admitted that lack of recreation could be damaging to an inmate's mental health." *Greason*, 891 F.2d at 839. Dr. Duncan "knew that the GDCC had no policies or procedures designed to help the staff and guards recognize suicidal tendencies and prevent suicide attempts," and he knew "about the severe lack of staff members and the need for a mental health care unit at the GDCC." *Greason*, 891 F.2d at 839. The Eleventh Circuit concluded that the

deliberate indifference claim against Dr. Duncan should be resolved by a jury because he was aware of "major problems at the GDCC," but he "apparently did not attempt to remedy" them. *Greason*, 891 F.2d at 839.

As for Warden Kemp, he was "responsible for ensuring that all services at the GDCC were properly provided." *Greason*, 891 F.2d at 839. The warden knew the approximate number of prisoners at GDCC who needed mental health care and the frequency of Dr. Fodor's visits to GDCC (once per week). *Greason*, 891 F.2d at 839. Moreover, Warden Kemp "was the person charged with ensuring the provision of services at the GDCC and was primarily responsible for staffing the GDCC; he therefore 'should have been aware' of the understaffing and its 'attendant problems.'" *Greason*, 891 F.2d at 839-40 (quoting *Fowler v. Cross*, 635 F.2d 476, 484 (5th Cir. 1981)). The warden, like the other supervisory defendants, was aware of a suicide that occurred the year before Mr. Greason's, but the supervisory defendants did not address the deficiencies in GDCC's mental health policies and procedures that led to that earlier suicide, exposing Mr. Greason to the same deficient policies and practices. *Greason*, 891 F.2d at 840. The Eleventh Circuit stated that "a reasonable person in [the warden's position] would know that his conduct constituted deliberate indifference." *Greason*, 891 F.2d at 840. Indeed, all three supervisory "officials should have known their conduct constituted deliberate indifference to a clearly established constitutional right." *Greason*, 891 F.2d at 840.

Ms. Abrams's allegations of notice to the state-level and St. Clair facility supervisory defendants are similar in all material respects to the evidence of notice in *Greason*.  More than one year before Mr. Abrams killed himself at the St. Clair Correctional Facility, through Judge Thompson's June 2017 opinion, supervisory defendants Dunn, Naglich, and Crook had actual notice of deficiencies in ADOC policies and practices concerning psychiatric care for prisoners that impacted the St. Clair facility and virtually all ADOC facilities throughout Alabama.  Ms. Abrams alleges that all of the supervisory defendants likewise had notice, and she alleges that all of them breached their obligations under the *Braggs* suicide prevention agreement to remedy the deficiencies.  If the *Greason* opinion is not a "materially similar case," the opinion at least identifies "a broader, clearly established principle" of which the supervisory defendants should be aware.  If nothing else, the factual allegations in Ms. Abrams's complaint establish that the supervisory defendants obviously violated the constitution by violating a court order that obligated them to comply with a suicide prevention agreement designed to correct deficiencies in mental health care throughout ADOC facilities.  *Dickinson*, 833 Fed. Appx. at 273-74; *see Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (finding that evidence of inmate abuse at the hands of guards is "sufficient to allow a jury to consider whether [a supervisory official] had established customs and policies that

resulted in deliberate indifference to constitutional violations and whether [the official] failed to take reasonable measures to correct the alleged deprivations.").

Therefore, the Court denies the supervisory defendants' motion to dismiss with respect to all defendants other than Jeff Williams, Ed Kern, and Edward Ellington.  Ms. Abrams's claims against those defendants are dismissed without prejudice.

## IV.

The supervisory defendants also ask the Court to dismiss Ms. Abrams's state law wrongful death claim.  Ms. Abrams has not addressed the defendant's contention that her wrongful death claim should be dismissed.  Therefore, the Court dismisses Ms. Abrams's Alabama wrongful death claim against the supervisory defendants without prejudice.

**DONE** and **ORDERED** this November 3, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE