FILED
2026 Sep-30 PM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARY ABRAMS,** as the personal representative and Administrator of the **Estate of RODERICK ABRAMS,** | } | |
| **Plaintiff,** | } | **Case No.: 2:20-cv-00011-MHH** |
| **v.** | } | |
| **JEFFERSON DUNN, et al.,** | } | |
| **Defendants.** | | |

# MEMORANDUM OPINION

Roderick Abrams committed suicide while incarcerated at St. Clair Correctional Facility, a state prison. On behalf of Mr. Abrams's estate, Mary Abrams, Mr. Abrams's mother, has sued Jefferson Dunn, the Commissioner of the Alabama Department of Corrections; Ruth Naglich, ADOC's Associate Commissioner of Health Services; Deborah Crook, ADOC's Director for Mental Health Services; Wexford Health Sources Inc., a corporation that contracted with ADOC to provide physical and mental health services at the St. Clair facility; and Barbara Coe, Wexford's Program Director – Mental Health. (Doc. 1).[1] Ms. Abrams

[1] Ms. Abrams originally sued several other individuals. The Court dismissed all claims against Ed Kern and Jeffrey Williams without prejudice due to Ms. Abrams's failure to plead supporting facts (*see* Doc. 53, pp. 22–23, 34), and Ms. Abrams has not filed an amended complaint. The other

alleges the defendants are liable in their individual capacities for violations of Mr. Abrams's Eighth Amendment rights. She also asserts claims against the defendants under Alabama's wrongful death statute. The defendants have moved for summary judgment. (*See* Docs. 120 (ADOC officials' joint motion), 113 (Ms. Coe's motion), 116 (Wexford's motion)). This opinion resolves the pending motions in this case.

The opinion opens with a statement of the legal standard that governs motions for summary judgment. Then, consistent with that standard, the Court summarizes the evidence in the summary judgment record, presenting the evidence in the light most favorable to Ms. Abrams, the non-moving party. Finally, the Court analyzes the evidence under the substantive law that governs Ms. Abrams's deliberate indifference and wrongful death claims to determine whether there are disputed questions of material fact for a jury to resolve.

## I.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment,

former defendants were dismissed from this case pursuant to stipulations. (*See* Docs. 96, 97, 101, 102).

a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Because the defendants have moved for summary judgment, in this opinion, the Court presents the evidence in the light most favorable to Ms. Abrams.

For claims arising under state law, the burden of proof "is a substantive issue and is therefore controlled by state law." *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990) (citations omitted). Likewise, under Rule 601 of the Federal Rules of Evidence, "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." FED. R. EVID. 601. Alabama state law governs Ms. Abrams's wrongful death claims against Wexford and Ms. Coe. Under the Alabama Medical Liability Act,

> [i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the

> standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.

ALA. CODE § 6-5-548(a). To meet this burden of proof, a plaintiff generally must present expert testimony from a "similarly situated health care provider[]" as defined by ALA. CODE § 6-5-548. *Glenn v. Corizon L.L.C.*, No. 21-10021, 2022 WL 1041338, at *3 (11th Cir. Apr. 7, 2022) (citing *Anderson v. Alabama Reference Lab'ys*, 778 So. 2d 806, 811 (Ala. 2000)); *see also Jackson v. Pleasant Grove Health Care Ctr.*, 980 F.2d 692, 695 & n.3 (11th Cir. 1993) (citations omitted) (same), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440 (2000); *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004) (citation omitted) (explaining that state rules regarding expert qualifications in medical malpractice cases "are often intimately intertwined with a state substantive rule," count as state law rules regarding witness competency under Rule 601, and apply in addition to *Daubert*'s requirements for admissibility of expert testimony).

## II.

**<u>Mr. Abrams's Incarceration</u>**

In 2004, Mr. Abrams was convicted of murder and sentenced to life in prison without the possibility of parole. (Doc. 119-31, p. 149, ¶ 2; Doc. 115-3, p. 8). Mr. Abrams was housed in several ADOC facilities during his incarceration. (Doc. 115-

3, p. 8). In 2017, ADOC transferred Mr. Abrams to St. Clair Correctional Facility in 2017, where he remained until his death in January 2019. (Doc. 118-4, p. 3).

While he was incarcerated, Mr. Abrams was stabbed and assaulted by other inmates and prison staff several times. (*See, e.g.*, Doc. 148-4, pp. 49–51; Doc. 118-7, pp. 12–13, tpp. 41–42; Doc. 148-5, pp. 75–78, 118–19, 128–29). He frequently expressed fear for his safety because of his sexuality, status as an ex-gang member, and drug debts. (*See generally* Doc. 118-5) (health and mental health records from August 2018 to death). Mr. Abrams was cited for disciplinary violations 38 times, for, among other things, assault, possession of weapons, being under the influence of drugs and/or alcohol, and stealing inmates' property. (Doc. 148-6, pp. 50–53).

Mr. Abrams was frequently placed in St. Clair's restrictive housing unit for disciplinary violations or safety concerns. (Doc. 118-4; Doc. 118-9, p. 46, tpp. 174–76). He spent most of the year before his death in the restrictive housing unit – the RHU. (Doc. 115-3, pp. 8–9). It is well-established that placement in restrictive housing or other forms of segregation increase the risk of mental health issues including suicide. (Doc. 115-3, p. 17). Most suicides occur in RHUs; ADOC and Wexford were aware of this fact. (Doc. 119-32, pp. 51–52, tpp. 69–71; Doc. 131-1, pp. 59–60). ADOC uses RHUs to prevent inmate-on-inmate violence, and Mr. Abram reported feeling safer in the RHU. (Doc. 118-5, pp. 14, 55; Doc. 118-9, p. 67, tpp. 259–61).

Before placing inmates in segregation, by policy, ADOC must screen inmates for mental health issues. (Doc. 115-3, p. 9; Doc. 119-31, p. 141). On an August 2, 2018 segregation admission screening form, Mr. Abrams reported that he felt sad, hopeless, or depressed, acknowledged a history of self-harm or attempted suicide, and indicated that he had been assaulted by another inmate. (Doc. 118-5, p. 2). He denied feeling suicidal at that time. (Doc. 118-5, p. 2). Elizabeth Wright, a registered nurse, performed the examination and discussed it with Amber Fox, "an associate licensed mental health professional, counselor." (Doc. 118-5, pp. 2–3; Doc. 118-1, pp. 5, 16; Doc. 119-32, pp. 45, 62, tpp. 42–45, 112–113). Ms. Fox cleared Mr. Abrams for admission to segregation and said mental health would follow up with him there. (Doc. 118-5, p. 2). ADOC released Mr. Abrams from segregation on August 10, 2017. (Doc. 118-4, p. 4).

On August 20, 2018, Mr. Abrams was sexually assaulted by two inmates in his cell. (Doc. 118-5, p. 4; Doc. 148-5, pp. 131–33). Mr. Abrams reported the assault two days later, on August 22, 2018, when medical staff evaluated him after he was pepper-sprayed while attempting to climb an interior fence in the general population yard. (Doc. 148-5, pp. 131–33; Doc. 118-5, p. 4). A mental health progress note dated August 22, 2018, states:

> (S) LMHP [(licensed mental health professional]) met with I/M [(inmate]) Abrams on this date in the mental health office due to PREA [(Prison Rape Elimination Act)] allegations. "I've been raped – people taking my sh-t!"

> I/M wrote statement and described at length the incident that took place. "They trying to get money from my mom and my sister online." Admits to using ICE last night. "I done some things I'm not proud of."
>
> (O) B/M [(black male)]. Alert and oriented x3. Presents with sad affect, anxious/tearful mood, and insight/judgment WNL [(within normal limits)]. Hygiene good as I/M just took a shower, dressed in clean state whites, with scar under right eye. Makes good eye contact, tearful throughout session, and engaged in conversation with normal speech pattern.
>
> (A) MH = Ø. Inmate experiencing ~~anxiou~~ anxiety and depression 2º ([secondary]) to recent PREA/safety incidents and admitted drug usage. Denies SI/HI [(suicidal ideations / homicidal ideations)] and A/V(H) [(auditory/visual hallucinations)].
>
> (P) I/M seen by medical and sent to crisis center. PREA officer and ADOC notified. Inmate referred to psyc associate for follow-up as needed.
>
> A. Fox, MA, ALC, MHP

(Doc. 118-5, p. 4). ADOC placed Mr. Abrams in the RHU. (Doc. 118-5, pp. 5–6). On August 27, 2018, Mr. Abrams tested positive for methamphetamine. (Doc. 148-5, p. 134).

On September 3, 2018, Mr. Abrams told Seargeant Jasper Luitze and/or J. Hutchings, a healthcare provider, that "I really need to see mental health"; Mr. Abrams visited the infirmary. (Doc. 118-5, pp. 7–9). Mr. Abrams reported to RN Jeremy Marcano that he was experiencing auditory hallucinations, and he had "told the folks [he] was going to hang [him]self." (Doc. 118-5, p. 8). RN Marcano called

Ms. Fox, and Ms. Fox instructed RN Marcano to return Mr. Abrams to his cell in RHU and that she would see him the following day because "he agreed he [would] be fine [until] then." (Doc. 118-5, p. 9).

There are no records of Ms. Fox meeting with Mr. Abrams the next day, September 4, 2018. Instead, J. Thomas, a licensed medical social worker, met with Mr. Abrams on September 4, 2018. (Doc. 118-5, pp. 10–12; Doc. 118-9, p. 48, tp. 184:4–6; Doc. 119-32, p. 70, tpp. 144:17). Mr. Thomas completed a progress note and a segregation risk assessment for Mr. Abrams and checked "no" for current thoughts of suicide or plan, history of suicide attempts/behaviors, and history of substance abuse treatment, among other items. (Doc. 118-5, p. 11). Mr. Thomas described Mr. Abrams's mood as "Dysthymic" (meaning depressed), with blunted affect and stable. (Doc. 118-5, p. 11). Mr. Thomas checked boxes for "routine mental health referral to be seen within 3 days by QMHP" and "psychotropic medication referral." (Doc. 118-5, p. 12). Per plaintiff's expert, Dr. Patterson, the segregation risk assessment "was five days late per policy requirements." (Doc. 115-3, p. 9).

The progress note for Mr. Thomas's September 4, 2018 meeting with Mr. Abrams states:

> (S) MHP met with I/M Abrams on this date for mental health assessment. I/M states "I got high, but I don't mess with people. I've been running from mental health, but I need some help." I/M discussed desire for transfer due to

> conflict with other inmates. I/M discussed reason for conflict is "due to me being a homosexual." I/M states he has been feeling depressed but further states "I can't kill myself because then I won't get my wings." I/M discussed with MHP to be added to the caseload, to which MHP reassured I/M that he would be added to the case load. I/M denies SI/HI, AH/VH.
>
> (O) I/M presents with blunted affect, dysthymic, oriented x 4 [(to time, place, person, and situation)], blunted insight/judgment, intact thought content, speech WNL, clean state whites, scruffy facial hair, appropriate hygiene.
>
> (A) I/M exhibits symptoms of mood disorder with depressive features. Could benefit from MH counseling, as well as psychiatric assessment to determine potential need for psychiatric medications.
>
> (P) Add I/M to MH case load, providing referral to psychiatric provider.
>
> J. Thomas, LMSW, SPM

(Doc. 118-5, p. 10).

The only documentation of Mr. Abrams being added to the mental health caseload after this was a comment in a December 22, 2018 progress note that "[Inmate] previously added to MH caseload and awaiting to be seen by psychiatric provider." (Doc. 118-5, p. 33). According to Ms. Abrams's expert, Dr. Patterson, the lack of other documentation indicates that Mr. Abrams was not added to the caseload despite being promised he would be. (Doc. 115-3, p. 19; Doc. 118-9, p. 44, tp. 168:20–22).[2] It is unclear whether the recommended psychiatric assessment

[2] Dr. Timothy Stone, M.D., Wexford's Director of Psychiatry at the time of Mr. Abrams's death, testified that inmates needed to be seen by a psychologist or psychiatrist before they could be added to the mental health caseload, and Mr. Abrams could not be added to the caseload because

for potential psychiatric medication took place. Mr. Abrams was not prescribed medication in prison, despite having taken Zoloft, Elavil, Prozac, Tegretol, and Ritalin before he was incarcerated. (Doc. 115-3, p. 8).[3] Neither the December 22, 2018 progress note nor the segregation risk assessment mentions Mr. Abrams's threats from the prior evening that he would hang himself, and there is no indication that Mr. Thomas spoke with Ms. Fox or reviewed her notes.

Mr. Abrams was not seen by mental health again until September 19, 2018. (Doc. 118-5, p. 13). A progress note from that date states:

> (S) LMHP met with I/M Abrams on this date in the mental health office of the RHU for his scheduled appointment. "Got a lot going on with myself." I/M expressed multiple issues going on at home. Discussed at length his difficult childhood including extensive drug use and behavioral issues. I/M admits continued drug use.
>
> (O) B/M. Alert and oriented x 3. Presents with full affect, bizarre mood, and insight/judgment intact but limited. Hygiene good, dressed in ADOC whites, and multiple tattoos. Actively engaged in conversation with normal speech pattern and bizarre thought content. Calm and cooperative.
>
> (A) I/M exhibiting bizarre delusional thinking exacerbated by history of extensive drug use. Denied SI/HI and A/V(H).
>
> (P) Continue mental health sessions as scheduled focusing on drug use and effects on mental status as well as identifying delusional thought patterns.

---

he refused to meet with a psychiatrist when Wexford scheduled an appointment for December 2018. (Doc. 148-51, pp. 15–16, tpp. 93–97).

[3] During her deposition, Ms. Abrams reported that Mr. Abrams had Bipolar Disorder and ADHD. (Doc. 118-6, p. 26, tp. 95).

A. Fox, MA, ALC, MHP

(Doc. 118-5, p. 13).

Mr. Abrams was seen next on October 10, 2018. The progress note from that date states:

> (S) LMHP met with I/M Abrams on this date in the mental health office of the RHU for scheduled appointment – "I been up for a few days – can't sleep. Believe I'm depressed." States he wrote to family but has not heard back. "Wanna go to Limestone – it's a better place. Can't go to Holman or West Jefferson, I got enemies there – one wants to come here real bad. Can't go to pop here – too many people out there in population I done stuff to, they want revenge." I/M refuses to give details, but states "I wanna talk to EGI. Inmates told me they can help me, but I ain't done no research."
>
> (O) B/M. Alert and oriented x 3. Presents with blunted affect, euthymic mood, and insight/judgment WNL. Good hygiene, dressed in ADOC whites, with graying facial hair. Makes good eye contact, engaged in conversation, normal speech pattern, logical thought content, calm, cooperative.
>
> (A) I/M reports depression and insomnia $2^0$ to placement and relationships with family. Denies SI/HI and A/V(H).
>
> (P) Continue mental health sessions as scheduled focusing on coping with depression and family issues.
>
> A. Fox, MA, ALC, MHP

(Doc. 118-5, p. 14).

Mr. Abrams's next four mental health appointments scheduled for November 20, 2018, November 27, 2018, November 30, 2018, and December 4, 2018 were cancelled because of ADOC security staff shortages. (Doc. 118-5, p. 15). Mr.

Abrams was released from RHU on December 4, 2018. (Doc. 118-4, p. 2; Doc. 118-1, p. 6).

On December 14, 2018, a Friday, Mr. Abrams returned to the RHU after hacksaw blades were discovered in his property in the dorm. (Doc. 118-4, p. 2; Doc. 148-5, p. 136–37; Doc. 118-5, pp. 16–19; Doc. 148-5, p. 136). The same day, Nurse Elizabeth Lindsey completed a medical exam, (Doc. 148-5, pp. 136–37), and RN Wright completed a health review form. (Doc. 118-5, p. 17). RN Wright noted that Mr. Abrams had puncture wounds on his thigh and ankle. (Doc. 118-5, p. 17). Mr. Abrams reported to Sergeant Jacob Weaver that he had been injured when he ran into the benches while playing basketball. (Doc. 148-5, p. 137). Also that day, another registered nurse, Zambia R. Playa, completed a segregation admission screening form. (Doc. 118-5, p. 18). RN Playa indicated that Mr. Abrams denied suicidal ideation, denied previous suicide or self-harm attempts, and acknowledged problems with family and feeling hopeless, sad, or depressed. (Doc. 118-5, p. 18). In response to "Have you been assaulted (physically or sexually) by another inmate?" "yes" is partially circled and "no" is fully circled. (Doc. 118-5, p. 18). A notation at the top says "2 yes." (Doc. 118-5, p. 18). RN Playa referred Mr. Abrams to Mr. Thomas but did not take other action. (Doc. 118-5, pp. 18–19). The mental health referral form notes that Mr. Thomas stated he would see Mr. Abrams the following Monday. (Doc. 118-5, p. 19). There are no records in Mr. Abrams's chart

indicating mental health personnel saw him the following Monday, December 17, 2018. A "Mental Health Segregation Rounds Log" dated December 18, 2018 indicates that a staff member named "Williams" walked by segregation cells to briefly check on inmates. (Doc. 118-5, pp. 22–29). Staff member Williams indicated "none reported" under the "problem" column. (Doc. 118-5, p. 23).

On December 21, 2018, Mr. Abrams told Sergeant Jason Norris that he was suicidal. (Doc. 148-5, p. 138). That day, Mr. Abrams was seen by a licensed practical nurse (signature illegible) and a registered nurse, John Moseley. (Doc. 118-5, pp. 30–32). The LPN documented wound care for Mr. Abrams's puncture wounds, and RN Moseley completed nursing encounter tool and segregation admission screening forms. (Doc. 118-5, pp. 30–32).

On the nursing encounter tool, RN Moseley indicated that Mr. Abrams's chief complaint was "suicide" with onset three days earlier. (Doc. 118-5, p. 32). RN Mosely indicated Mr. Abrams had suicidal thoughts, aggressive behavior, homicidal thoughts, and difficulty sleeping. (Doc. 118-5, p. 32). RN Moseley noted Mr. Abrams was oriented to person, place, and time, but he presented as aggressive, anxious, hyperactive, rapid speech, paranoid, depressed, and irritable. (Doc. 118-5, p. 32). In the comments section of the note, NR Moseley wrote that Mr. Abrams "stated that he did not want anything to eat. Stated that he plans [illegible] himself or [illegible] himself." (Doc. 118-5, p. 32). On the segregation admission screening

form, RN Moseley reported that Mr. Abrams said yes to suicidal ideation; feeling sad, hopeless, or depressed; believing someone or something is out to get him or harm him; and that he had had serious problems with a significant other, family member, or friend recently. (Doc. 118-5, p. 31). RN Moseley placed Mr. Abrams in a crisis cell on acute suicide watch pending assessment by a mental health professional. (Doc. 118-5, p. 31).[4] Wexford personnel kept logs documenting their observation of Mr. Abrams while he was on acute suicide watch. (Doc. 118-5, pp. 35-37).

The following day, December 22, 2018, Casey Williams, a mental health practitioner, met with Mr. Abrams at 7:51 a.m., 8:31. a.m., and 11:36 p.m. (Doc. 118-5, p. 33; Doc. 148-5, p. 138). The portion of the progress note pertaining to the first meeting states:

> (S) MHP met [with] I/M Abrams in the mental health office of the infirmary following placement in the crisis cell last night. I/M Abrams was agitated and rambling about placement back in P/Q dorm. Inmate relates recent SI to where he is living and does not feel safe. Stated that he came to the infirmary to have stab wounds looked at and then felt ↑ed anxiety about returning to block. Hx [(history)] of debt issues [with] other inmates noted along [with] extensive drug use.
>
> (O) B/M. Alert and oriented x 3. Presents anxious and paranoid. Focused on block placement and limited contact [with] (M).

---

[4] Mr. Abrams had been put on suicide watch at least once before, in 2008. (Doc. 148-51, p. 10, tp. 71).

> (A) I/M exhibits symptoms of mood D/o [(disorder)] [with] depressive features. I/M could benefit from MH ind. counseling sessions and possible ΨMD [(meaning psi M.D., i.e., psychiatrist)] assessment.
>
> (P) I/M previously added to MH case load and awaiting to be seen by psychiatric provider. C. Williams, CPC MHP

(Doc. 118-5, p. 33). The portion of the progress note pertaining to the second meeting states:

> MHP called Dr. Thrower to discuss I/M's status and what brought him to this point. After conducting a SRA [(meaning a suicide risk assessment)] and reporting findings to the ΨMD, it was concluded that the I/M could be moved from acute to NASW [(meaning non-acute suicide watch)] effective immediately. Will follow-up on 12/24/18. C. Williams, CPC MHP

(Doc. 118-5, p. 33). The portion of the progress note pertaining to the third meeting states:

> S Denies being suicidal @ present
>
> O [illegible] V/S [(vital signs)] Refused
>
> A Altered thought process
>
> P Continue to monitor

(Doc. 118-5, p. 33).

Mr. Abrams was on non-acute suicide watch from December 22, 2018 through December 26, 2018. (Doc. 118-1, p. 11). Wexford personnel kept logs documenting their observation of Mr. Abrams while he was on non-acute suicide watch. (Doc. 118-5, pp. 36, 38–48, 50–52, 56–60). Wexford personnel also wrote abbreviated progress notes for December 23 through 27. (Doc. 118-5, pp. 45, 48, 60). In these

progress notes, Wexford personnel reported that Mr. Abrams consistently denied being suicidal, although he had “altered thought process,” with one Wexford staff member noting a “risk of self-harm”:

12/23/18
0830

S: I/M stated “not right now to / of SI ([suicidal ideations]).

O: A&O x 4 ~~Declines V/S.~~

A: Altered thought process.

P: Continue to monitor

E: Call for needs. M.G[illegible]beax, RN

12/23/18
0835

S: Denies being suicidal at moment

O: A&O x 4, Declines V/S.

A: Altered thought process.

P: Continue to monitor

E: I/M acknowledged to call [with] needs. M.G[illegible]beax

12/23/18
1900

S Denies being suicidal @ present

O A&O x 3 V/S Refused

A Altered thought process

P Continue to monitor

E Call [with] needs THaynes

12/23/18
2330

S Denies being suicidal @ present

O A&O x 3 / V/S Refused

A Altered thought process

P Continue to monitor

E Call [with] needs THaynes

….

12/24/18
0800

S: I/M denies SI @ this time.

O: A&O x 3, NAD., VS. refused

A: Altered thought process.

P: Continue to monitor

E: Call for assistance E. Wright, RN

12/24/18
1600

S: I/M denies SI.

O: A&O x 3. V/S refused.

A: Altered thought process.

P: Continue to monitor

E: Call for assistance. M.G[illegible]beax, RN

12/24/18
2330

S Denies being suicidal @ present

O A&O x 3 V/S Refused

A Risk for Self harm

P Continue to monitor

E Call [with] needs THaynes RN

12/25
74

S Denies SI

O A&O x 3 Ref. V/S

A Alt thought process

P Continue to mon

E Call [with] needs LM[illegible]

….

12/26
1500

S: Denies SI

O: A&O x 3 NAD

A: Alt thought process.

P: Call [with] needs

E: Cont to mon [illegible signature]

2300
12/25

S: I/M denies SI.

O: A&O x 3, V/S refused, Ø complaints

A: Altered thought process.

P: Continue to monitor.

E: Call for assistance as needed. [illegible signature]

12/26/18
0700

S – Denies SI

O – A/O x 3 ® VS

A – Altered thought process

P – Continue to monitor

E – Call for assistance Sw[illegible]L

12/27/18
0800

S – Denies SI.

O – A&O x 3. VS 98-91-16-106/63-97%

A – Altered thought process.

P – Continue to monitor.

E – Call for assist [illegible] EWright, RN

(Doc. 118-5, pp. 45, 48, 60).[5]

On December 26, 2026, Wexford discontinued Mr. Abrams's suicide watch. (Doc. 118-1, p. 11). At 9:00 a.m. that day, an unknown nurse or mental health provider completed a progress note, stating:

> "I want out of this mother fucker cell! When somebody gonna let me outta here? I don't need to be in here. I don't know why they put me in this mother fucker place.["] IM A&O x 3. Eye contact. IM is loud, yelling, banging & kicking on cell door. IM states he was found [with] hacksaw blades and claimed to be suicidal to get help. IM states calling suicide was the only way to get someone (from ADOC) to talk to him. IM denies SI. IM advised he needs to remain calm and stop yelling & beating on cell door. IM advised counselor would be by to speak [with] him. IM stated his understanding. Will cont to monitor. [illegible signature]

(Doc. 118-5, p. 54). Later that day, at 2:40 p.m., Mr. Thomas conducted an "Abbreviated Suicide / Self-Injury Risk Assessment." (Doc. 118-5, p. 53). Mr. Thomas noted that Mr. Abrams denied suicidal ideations; he assessed Mr. Abrams as low risk and checked a box stating "[r]isk has been adequately addressed and precautions may be discontinued." (Doc. 118-5, p. 53). Mr. Thomas also checked boxes for hopelessness and/or helplessness and noted Mr. Abrams "discusse[d] recently obtained disciplinary and feelings of being wrongfully accused." (Doc.

[5] The Court has tried to decipher signatures and match handwriting to give some sense of how many people were involved in Mr. Abrams's care. The Court may have made mistakes in deciphering signatures.

118-5, p. 53). In an accompanying progress note dated 2:40 and 3:15 p.m., Mr. Thomas wrote:

> (S) MHP met with I/M Abrams on this date for f/u on non-acute suicide watch. I/M discussed recently obtained disciplinary and conflict with gang affiliated I/Ms due to his sexuality. I/M states "They banging against [illegible—this?] black sissys now instead of gang banging." I/M stated he desires a transfer to another institution as he feels that he will be safer from conflict with gang-affiliated inmates. MHP discussed with I/M appropriate channels through which to request a transfer. I/M discussed alleviation of anxiety due to RH placement and discussed fear for safety. I/M denies SI/HI, AH/VH.
>
> (O) I/M presents with mild anxious mood, congruent affect, oriented x 4, limited insight/judgment, intact thought content, speech WNL, safety mock, alert, calm, polite.
>
> (A) I/M verbalizes security issues negatively affecting mood and functioning. Expressed relief due to placement in RHU.
>
> (P) Assist inmate in process of requesting transfer to another institution. Staffed with Dr. Gawronski to discharge I/M Abrams from NASW. Follow up in three days assessing suicide risks, mood and functioning.
>
> J. Thomas, LMSW, SPM

(Doc. 118-5, p. 55). "Dr. Gawronski" is Brian Gawronski, M.D., a psychiatrist then-employed by Wexford. (Doc. 118-1, p. 14). It is undisputed that, per Mr. Thomas's notation, Dr. Gawronski concurred in the discharge of Mr. Abrams from non-acute suicide watch. (Doc. 118-9, p. 81, tpp. 314–317; Doc. 118-1, p. 15).

When Mr. Abrams's non-acute suicide watch ended on December 26, 2018, ADOC did not have restrictive housing cells available. (Doc. 118-1, pp. 14–15).

ADOC held Mr. Abrams in the infirmary in the crisis cell until January 2, 2019, when a restrictive housing cell became available. (Doc. 118-1, pp. 15–16; Doc. 118-9, p. 46, tpp. 174–77; Doc. 118-4, p. 2). Wexford personnel did not perform a formal three-day follow-up appointment, as was generally required following discharge from suicide watch. (Doc. 118-1, p. 16; Doc. 118-9, pp. 45–46, tpp. 172–77). Mr. Abrams's movement records indicate he moved into a restrictive housing cell at 7:07 a.m. on January 2, 2019. (Doc. 118-4, p. 2).

**<u>The Day of Mr. Abrams's Suicide</u>**

The last documented encounter between Mr. Abrams and Wexford personnel is a progress note dated January 2, 2019 at 2:40 p.m. It states:

> (S) LMHP met with I/M Abrams on this date in the mental health office of the RHU for his 7-day follow-up from release from watch. I/M states "man, I been bamboozled man! I ain't supposed to be back here man! They put hacksaw blades in my box man. I don't do hobby craft, what I gonna do with hacksaws man?! And I was supposed to get a visit from my mom and she came up here, but I was back here man and I didn't even get to call her!" LMHP allowed I/M to vent about frustrations and encouraged him to focus on things individually. I/M states "everytime they put me out there, they put me in P-Q around the same people. A guy like me, I'm gay and I'm handicapped, I got to get in with someone for protection. I was hanging around Big J. I know they put that stuff in my box!" Discussed future plans. he states he would like to go to G-dorm and obtain his GED.
>
> (O) B/M. Alert and oriented x 3. Presents with anxious mood, congruent affect, and insight/judgment intact but limited. Hygiene good, clean state whites, groomed appropriately.

> Cooperative, engaged in conversation. normal speech pattern and intact thought content.
>
> (A) I/M expresses frustration and anxiety $2^0$ to safety concerns and issues with other I/Ms (CRIPS) and mother. I/M identifies positive coping strategies and future plans. I/M Abrams has hx of maladaptive behavior leading to crisis cell placement exacerbated by frequent drug use. I/M stable. Denies SI/HI and A/V(H).
>
> (P) [AF error] MH to follow-up with I/M Abrams following disciplinary court hearing and phone call with mother (ADOC CO took I/M to use phone upon leaving session). MH to follow-up on 30-day follow-up to assess mental status and continue focusing on steps for future.
>
> A. Fox, MA, ALC, MHP

(Doc. 118-5, pp. 62–63).

Ms. Abrams testified that she spoke to Mr. Abrams at 7:00 or 7:30 a.m. on January 2, 2019. (Doc. 118-6, pp. 20–21, 33–35, 37, 42–44, tpp. 73–76, 123–31, 140, 161–66).[6] Mr. Abrams told Ms. Abrams that "he had been to the front to see the nurse, and the nurse got him to use the telephone." (Doc. 118-6, pp. 20–21, tpp. 73–74). When Ms. Abrams asked him "why was he at the nurse," Mr. Abrams responded that "he had got stabbed in the eye, and they went to go check on it . . . [because] his eye was draining." (Doc. 118-6, p. 21, tp. 74). A correctional "officer

[6] Ms. Abrams's recollection that her call with Mr. Abrams took place around 7:00 a.m. is inconsistent with the progress note above, which indicates that Mr. Abrams had not yet spoken to his mother when he met with Ms. Fox at 2:40 p.m. and that he was being taken to speak with her after that meeting. The exact time is not dispositive, so the Court has ordered Mr. Abrams's interactions with Ms. Fox and Ms. Abrams in the way that seems most consistent with the evidence.

told him he had five or ten minutes, [then] he had to get off the phone." (Doc. 118-6, p. 21, tp. 74).

Ms. Abrams said Mr. Abrams "was happy that morning" when she spoke to him and "was waiting on his money to come." (Doc. 118-6, pp. 33, 43–44, tpp. 123–25, 163–66). Ms. Abrams also said that Mr. Abrams repeatedly told her that "he was concerned about going back there to his cell," asked Ms. Abrams to call the Warden "because I don't want to go back there to that cell," and said that he felt no one was listening to him. (Doc. 118-6, pp. 20–21, 33, tpp. 73–75, 125). Mr. Abrams told his mother that he "he loved [her], he loved his sisters and brothers and everybody." (Doc. 118-6, pp. 21, 43, tpp. 74–75, 165). Ms. Abrams told him not to talk "like that," asked him why he couldn't talk to her, advised him to try to talk to the chaplain, and told him that she loved him. (Doc. 118-6, pp. 21, 37, 43–44, tpp. 74–75, 140, 164–66). Ms. Abrams said "it was something that wasn't right." (Doc. 118-6, p. 43, tp. 165). Ms. Abrams attempted to call the warden that morning but did not reach her. (Doc. 118-6, p. 21, tpp. 75–76). Ms. Abrams did not want to believe her son was suicidal because "he was stronger than that. And he had faith." (Doc. 118-6, pp. 34–35, tpp. 129–31).

According to James Ware, an inmate housed across from Mr. Abrams, when Mr. Abrams was escorted to or from his cell in restrictive housing that day, "the officers jumped on [Mr. Abrams] . . . in the hallway." (Doc. 118-7, pp. 7–9, 27–28,

tpp. 21–27, 101–03).[7] Mr. Ware "couldn't really see it, but you could hear it . . . I heard the scuffle. I heard him yelling. I heard him – you know what I'm saying, like, crying for his life." (Doc. 118-7, pp. 7–9, 41, tpp. 21–24, 27, 154–57). Mr. Abrams "looked pretty roughed up" when he was placed in his cell, "like his clothes and his stuff – you know, you could tell he's been in a tussle." (Doc. 118-7, p. 8, tpp. 24–25). Mr. Ware could not recall seeing blood or bruises but noted "[y]ou can tell it in they face" when someone's been hit. (Doc. 118-7, pp. 8–9, tpp. 25–26).[8] Mr. Abrams's autopsy report indicated he had "MINOR BLUNT FORCE INJURIES: A 1-3/4 inch cluster of red abrasions . . . on the anterior right shoulder," but the autopsy report did not indicate the likely cause or timing of these injuries. (Doc. 118-8, p. 3).

Per Mr. Ware, Officer Brandon Burns brought Mr. Abrams to his cell sometime roughly between 4:30 and 5:30 p.m., sometime around dinner. (Doc. 118-7, pp. 23, 42, tpp. 82–85, 159–61). According to Mr. Ware, Mr. Abrams told Officer

---

[7] The precise timing of the assault is unclear from the record. That day, ADOC officers took Mr. Abrams out of restrictive housing to speak to Ms. Fox, to speak to his mother, and possibly to pick up his property, (Doc. 118-7, p. 40, tpp. 152–53), though these were not necessarily separate trips, and Mr. Ware had trouble remembering if the assault took place when Mr. Abrams was being taken out of his cell or placed in it, (Doc. 118-7, pp. 27–28, tpp. 101–02). Mr. Ware was consistent in placing the assault sometime before the verbal altercation described below. (Doc. 118-7, pp. 7, 27–28, 40–42, 46, tpp. 20, 101–02, 152–58, 175).

[8] This was not the only time officers "jumped on" Mr. Abrams; Mr. Ware heard it happen "[m]aybe two or three times." (Doc. 118-7, pp. 12–13, tpp. 41–42).

Burns multiple times that he was going to kill himself, and Mr. Abrams asked to be taken back to a mental health cell. (Doc. 118-7, pp. 6–7, 29, 33, 41–43, tpp. 14, 17–18, 21, 109, 125, 157–58, 162). Officer Burns called him a "sissy" and "faggot," "fucked with his head," and "told him to go ahead and kill" himself. (Doc. 118-7, pp. 6, 11–12, 14, 29, 32–33, 42, tpp. 14–15, 35–38, 47, 106–08, 120–25, 158–59).[9] Officer Burns walked off. (Doc. 118-7, pp. 14, 33–34, tpp. 47–48, 125–26). Wexford personnel were not present during Mr. Abrams's altercation with Officer Burns. (Doc. 118-7, p. 39, tp. 147).

Mr. Abrams hanged himself from a vent grate with a piece of his blanket shortly after Officer Burns left. (Doc. 118-7, pp. 14, 23–25, tpp. 47–48, 85–90; Doc. 148-5, pp. 139–41; Doc. 118-5, pp. 64–68).[10] An autopsy toxicology report showed the presence of synthetic marijuana and methamphetamine in Mr. Abrams's system. (Doc. 118-8, p. 8; Doc. 118-1, p. 18). Dr. Timothy Stone, M.D., who was Wexford's Director of Psychiatry when Mr. Abrams died, testified that "[b]ased on the rapid

---

[9] Mr. Ware stated that "Most inmates [tell the officers] before they commit suicide. They let the officers know. The officers just – you know, you got some officers that take it serious. Some officers don't. The majority of the time, the officers don't take it serious." (Doc. 118-7, p. 13, 32, tp. 45, 120–21). "It depends on the officer." (Doc. 118-7, p. 32, tp. 120). According to Mr. Ware, officers also differed in whether they mistreated inmates in other ways. Officer Burns had a history of mistreating inmates. (Doc. 118-7, pp. 47–48, tpp. 178–83). "You got some officers that – every officer is not like this, but you got some officers that are corrupt." (Doc. 118-7, p. 48, tp. 182).

[10] Mr. Ware expressed uncertainty about the exact timeline because he did not have access to clocks, prison can distort inmates' sense of time, and five years had passed between Mr. Abrams's suicide and Mr. Ware's deposition. (Doc. 118-7, pp. 24–26, 37, 39, tpp. 89–97, 138–39, 149). Mr. Ware said that to him, everything felt fairly "back to back" after Officer Burns told Mr. Abrams to kill himself. (Doc. 118-7, pp. 24, 26, tpp. 89, 94–97).

metabolism of methamphetamine to amphetamine and the absence of any amphetamine found in Mr. Abrams['s] toxicology samples, the substances found in his system were ingested in close proximity to the time of death," at the very least after his 2:40 p.m. mental health appointment, although Dr. Stone did not give a precise time. (Doc. 118-1, p. 18; Doc. 148-51, pp. 17, 19–20, tpp. 99, 109–11). Dr. Patterson did not review the autopsy report before his deposition and did not have the expertise to say when Mr. Abrams may have ingested the drugs; he conceded that nothing in Ms. Fox's 2:40 p.m. progress note indicates that Mr. Abrams was under the influence at that time. (Doc. 118-9, pp. 35, 80–81, tpp. 130, 310–17). Dr. Patterson testified that he was generally aware that drugs such as methamphetamine and synthetic marijuana can cause or contribute to rapid-onset suicidal ideation in as little as 15 minutes. (Doc. 118-9, pp. 34–35, 80, tpp. 127–30, 312–13).

Neither correctional officers nor Wexford personnel were nearby when Mr. Abrams hanged himself. (Doc. 118-7, pp. 14, 33–34, 39, tpp. 47–48, 125–26, 147). Mr. Ware did not see Mr. Abrams hanging himself or preparing to hang himself; he only noticed Mr. Abrams hanging when other inmates started making noise, banging on their cell doors, and yelling that an inmate had killed himself. (Doc. 118-7, pp. 14–15, 35–36, tpp. 48–53, 130–35).

Between roughly 5:30 and 6:30 p.m., while "the whole block was [still] beating on the door yelling that the man is dead in his cell," an officer came around

for the last security check of his shift, saw Mr. Abrams hanging, and "kept on going like he was trying to get off work or something." (Doc. 116-7, pp. 6, 14–16, 23–26, 35–36, 43–44, tpp. 15–16, 48–53, 56, 83–97, 130–35, 165–66; Doc. 148-44, p. 54, tp. 46; Doc. 148-46, pp. 45, 47, tpp. 23, 28).[11]

After the shift change, around 7:00 p.m., Officer Steven Thompkins discovered Mr. Abrams hanging. (Doc. 118-7, pp. 16, 44, tpp. 56–57, 167–68; Doc. 119-4, pp. 140–41; Doc. 148-44, p. 54, tp. 46; Doc. 148-5, pp. 139–41). According to Officer Thompkins, Mr. Abrams appeared to be standing in a corner of the cell, facing away from him; Officer Thompkins could not see the noose. (Doc. 148-45, pp. 3–4, tpp. 106–07, 110–11; Doc. 148-38, p. 8). Officer Thompkins called to Mr. Abrams, and Mr. Abrams did not respond. (Doc. 148-45, pp. 3–4, tpp. 107–08, 111–12; Doc. 148-38, p. 8). Because it can be unsafe to approach inmates alone, Officer Thompkins called his supervisor, Sergeant Luitze. (Doc. 148-45, pp. 3–4, tpp. 107–08, 111–12; Doc. 148-38, p. 8). Sergeant Luitze and Officer Thompkins entered Mr. Abrams's cell and discovered that Mr. Abrams was unresponsive. (Doc. 148-5, pp.

[11] Mr. Ware could not recall the name of the officer who walked past without doing anything, but Mr. Ware believed it was "[w]hoever worked the cube that day." (Doc. 118-7, pp. 6, 22, 24, tpp. 15–16, 78–81, 86–87). The attorney for Officer Burns and Officer Robert Taylor identified the officer as Officer Taylor because he was working the cube that day. (Doc. 118-7, p. 25, tp. 92). During his deposition, Officer Taylor stated that cube officers write down incoming calls and remotely unlock doors; do not leave the cube during their shifts, not even to go to the bathroom because there is a toilet in the cube. (Doc. 148-46, pp. 47–48, 50, tpp. 29–33, 39–41). The identity of the officer who walked by is not critical to the remaining claims in this case.

139–40).[12] Around 7:06 p.m., Sergeant Luitze called his supervisor, Kenneth Robertson, who arrived with RN Marcano, RN Wright, and licensed practical nurse Delaine Kerr at around 7:11 p.m. (Doc. 148-5, pp. 139–40; Doc. 118-5, p. 64).[13] The nurses administered CPR to Mr. Abrams but were unable to revive him. (Doc. 148-5, pp. 139–40). The nurses noted that Mr. Abrams was cold to the touch when they arrived. (Doc. 118-5, pp. 64–68).

After Mr. Abrams's suicide, Mr. Ware called Tameka Abrams, one of Mr. Abrams's sisters, to let his family know, and Mary Abrams spoke with Mr. Ware on Tameka Abrams's phone. (Doc. 118-6, pp. 44–45, tpp. 166–72). Afterward, Mary Abrams tried calling the warden again and reached her this time. (Doc. 118-6, pp. 75–76; Doc. 148-5, p. 140).[14]

***Braggs* class action**

Mr. Abrams's suicide occurred while a prisoner class action concerning ADOC's alleged deliberate indifference to the mental health needs of prisoners was pending. *See generally Braggs v. Hamm*, No. 14-cv-00601 (M.D. Ala. June 17, 2014), *appeal docketed*, No. 22-10292 (11th Cir. Jan. 26, 2022). Mr. Abrams was

---

[12] In his deposition, Officer Thompkins recalled more people arriving before anyone entered Mr. Abrams's cell. (Doc. 148-44, p. 57, tpp. 60–61; Doc. 148-45, pp. 11–12, tpp. 41–43). The record is inconsistent as to the exact times different people were called and arrived.

[13] Another licensed practical nurse, Mr./Ms. Henry, may have arrived earlier. (Doc. 118-5, p. 64).

[14] All instances of "Ms. Abrams" in this opinion refer to Mr. Abram's mother, Mary Abrams. The Court has used full names in this paragraph to avoid confusion.

not a named plaintiff in *Braggs*, but he may have qualified as a class member. The named plaintiffs in *Braggs* sued Commissioner Dunn and Associate Commissioner Naglich as defendants in their official capacities. Wexford was not a defendant.

In January 2017, before Mr. Abrams's suicide, the *Braggs* parties signed a voluntary interim agreement, (Doc. 118-3), which the *Braggs* court entered as an order, (Doc. 118-2). The order states that "[t]he parties agree that the agreement is only an interim measure and does not constitute a final resolution of any of the issues currently before the court." (Doc. 118-2, p. 3). The order was in force when Mr. Abrams died. In relevant part, the order agreed to by the *Bragg* parties provides:

> 1. Licensed Mental Health Professionals ("MHPs")[15] will be hired for the mental health program in ADOC. Each Major Facility[16] will have at least one full time (1 FTE) licensed MHP, and the treatment hubs—Bullock, Donaldson, and Tutwiler—will have at least two (2 FTEs) licensed MHPs. There will be two (2) licensed MHPs on site for at least 8 hours per day every business day at each treatment hub. There will be at least one (1) MHP at each treatment hub on the weekends and holidays.
>
> 2. Any employee of ADOC, MHM, or Corizon (or any other contractor retained to provide medical or mental health care in ADOC facilities) may present a person to mental health or medical staff for assessment for suicide watch. Whoever places a person on watch must notify appropriate

---

[15] A Licensed Mental Health Professional means any individual who has satisfied the licensing requirements promulgated by the Alabama Board of Examiners in Counseling, Ala. Admin. Code Section 255-X-3-.01 et seq., and currently holds a valid license from the Alabama Board of Examiners in Counseling.

[16] A Major Facility is defined as all ADOC facilities except any designated community based facility ("work release") or community work center.

MHM staff. If the person is identified when no MHM staff is on site, the appropriate MHM on-call staff must be notified.

3. Upon being presented to mental health or medical staff for assessment for suicide watch, each person will be maintained under "constant watch"[17] at least until they have been evaluated as described in No. 4 below.

4. After a person's initial placement on suicide watch and referral for mental health evaluation, each person will be evaluated using the MHM suicide risk assessment to determine if the individual is "acutely suicidal" or "nonacutely suicidal," as these terms are defined in the National Commission on Correctional Health Care standard MH-G-04. These evaluations will be conducted out of cell and in a confidential setting.

   a. Licensed psychiatrists or licensed psychologists may conduct these evaluations either in person or by telepsychiatry. In the event that they are conducted by telepsychiatry, the person being evaluated will be in a room with a mental health professional (licensed or otherwise), psychological associate (licensed or otherwise), or Certified Registered Nurse Practitioner ("CRNP").

   b. CRNPs may conduct these evaluations but only if they are conducted in person. Upon conducting any such evaluation, a CRNP must confirm their assessment with a psychiatrist or psychologist either in person, by telepsychiatry, or over the phone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental health evaluations and counseling that have been conducted in the past 14 days.

---

[17] "Constant watch" as used in this Agreement is a procedure that ensures one-on-one visual contact at all times, except to the extent that the physical design allows an observer to maintain an unobstructed line of sight with no more than two people on suicide watch at once. At all times, there will be a person designated in writing with responsibility for maintaining constant watch. Upon transfer of the watch responsibility from one person to another, the transfer will be documented.

c. Once the licensed MHPs are in place at each facility, they may conduct these evaluations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described in 4.b. above.

d. Prior to conducting any such evaluations, licensed MHPs and CRNPs must complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by Associate Commissioner Ruth Naglich, Dr. David Tytell, Dr. Robert Hunter, Dr. Charles Woodley (or any subsequent replacements), and the agreed-upon monitor or Plaintiffs' experts if the agreed-upon monitor has not yet been retained.

5. Any person who is determined to be acutely suicidal shall be monitored through a constant watch procedure.

6. Any person who is determined to be nonacutely suicidal shall be monitored through a close watch procedure that ensures monitoring by ADOC staff at staggered intervals not to exceed every 15 minutes.

7. Both constant watch and close watch shall be contemporaneously documented at staggered intervals not to exceed 15 minutes on a record maintained on each individual cell door. Upon discharge from suicide watch, these records will be maintained in a facility-based suicide watch log and in the individual prisoner's medical record.

8. ADOC Administrative Regulation 630, which currently mandates 15-minute intervals for monitoring on suicide watch will be revised to reflect the constant watch process and the staggered 15-minute monitoring for persons deemed nonacutely suicidal.

9. All risk assessments shall be forwarded to Dr. Robert Hunter and Dr. David Tytell (or any subsequent replacement), who will conduct monthly evaluations of completed suicide risk assessments and issue immediate corrective actions and training if necessary based on the review of those evaluations.

10. A person may be discharged from suicide watch following an out of cell, confidential evaluation according to the following terms.

    a. Licensed psychiatrists or licensed psychologists may conduct these evaluations either in person or by telepsychiatry. In the event that they are conducted by telepsychiatry, the person being evaluated will be in a room with a mental health professional (licensed or otherwise), psychological associate (licensed or otherwise), or CRNP.

    b. CRNPs may conduct these evaluations but only if they are conducted in person. Upon conducting any such evaluation, a CRNP must confirm their assessment with a psychiatrist or psychologist either in person, by telepsychiatry, or over the phone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental health evaluations and counseling that have been conducted in the past 14 days.

    c. Once the licensed MHPs are in place at each facility, they may conduct these evaluations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described in 9.b. above.

    d. A person may not be discharged from suicide watch via telepsychiatry until the person conducting the evaluation has sought input from the MHP or counselor who has been primarily responsible for providing mental health services to the person on suicide watch, except in exceptional circumstances, which shall be documented.

    e. Prior to conducting any such evaluations, licensed MHPs and CRNPs must complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by Associate Commissioner Ruth Naglich, Dr. David Tytell, Dr. Robert Hunter, Dr. Charles Woodley (or any subsequent replacements), and the

agreed-upon monitor or Plaintiffs' experts if the agreed-upon monitor has not yet been retained.

f. Each patient placed on constant watch will be reduced to a close watch prior to release from suicide watch.

11. Upon release from suicide watch, each person will have at least three follow-up examinations by mental health staff. The first follow-up examination will occur within three calendar days of the release from suicide watch. The second follow-up examination will occur within seven calendar days of the release from suicide watch. The third follow-up examination will occur within 30 days of the release. The first two follow-ups will occur within the stated timeframe, regardless of the day of the week. If 30 days from release falls on a weekend, the 30-day follow-up can take place during the following work week.

a. The follow-up examinations described in paragraph 10 will be conducted out of cell and in a confidential setting. The follow-up examinations do not take the place of otherwise scheduled mental health appointments, though they may occur in connection with or contiguous with such appointments. The mental health staff conducting the follow-up examinations shall assess whether the person released from suicide watch is showing signs of on-going crisis, whether the person needs further follow-up examinations, and whether the person should be added to the mental health caseload or assigned a different mental health code.

b. Licensed psychiatrists or licensed psychologists may conduct these follow-up examinations either in person or via telepsychiatry. In the event that the follow up examinations are conducted via telepsychiatry, the person being evaluated will be in a room with a mental health professional (licensed or otherwise), psychological associate (licensed or otherwise), or CRNP.

c. CRNPs may conduct these follow-up examinations but only if they are conducted in person. Upon conducting

any such evaluation, a CRNP must confirm their assessment with a psychiatrist or psychologist either in person, via telepsychiatry, or over the telephone. The psychiatrist or psychologist must be provided with and review the risk assessment and the notes of the mental health evaluations and counseling that have been conducted in the past 14 days.

d. Once the licensed MHPs are in place at each facility, they may conduct these follow-up examinations but only if they are conducted in person and confirmed with a psychiatrist or psychologist as described in 10.b. above.

e. Prior to conducting any such follow-up examinations, licensed MHPs and CRNPs must complete a training on suicide prevention, assessing suicidality, and procedures of suicide watch. This training must be approved by Associate Commissioner Ruth Naglich, Dr. David Tytell, Dr. Robert Hunter, Dr. Charles Woodley (or any subsequent replacements), and the agreed-upon monitor or Plaintiffs' experts if the agreed-upon monitor has not yet been retained.

12. ADOC leadership at the warden level or higher shall issue an order by January 11, 2017 at the latest that mental health staff, including contract mental health staff and ADOC psychologists or psychological associates, conduct mental health rounds or Segregation Board rounds at least five times each week as required by Admin. Reg. 624.1

3. Mental health staff conducting mental health rounds for suicide watch shall contemporaneously document rounds on each individual cell door. Upon discharge from the unit, these records will be maintained in a facility-based mental health rounds log and in the individual prisoner's medical record.

(Doc. 118-3, pp. 2–5).

In June 2017, the *Braggs* court found many deficiencies in ADOC's and MHM's (one of Wexford's predecessors') conduct and noted that "the overarching issues that permeate each of the []identified contributing factors [to] inadequate mental-health care" were "persistent and severe shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1268 (M.D. Ala. 2017). The *Braggs* court did not enter an injunction or final judgment in conjunction with the June 2017 opinion. *Braggs*, 257 F. Supp. 3d at 1268 ("No partial final judgment shall issue at this time as to the claim resolved in this entry.").

After the June 2017 liability opinion, the *Braggs* court entered several opinions, remedial orders, and judgments. *See, e.g.*, *Braggs v. Dunn*, No. 14-cv-00601, 2018 WL 985759 (M.D. Ala. Feb. 20, 2018) ("Phase 2A Understaffing Remedial Opinion"); *Braggs v. Dunn*, 562 F. Supp. 3d 1178 (M.D. Ala. 2021) ("Phase 2A Omnibus Remedial Opinion"), *aff'd in part, rev'd in part sub nom. Dunn v. Comm'r, Alabama Dep't of Corr.*, 179 F.4th 1277 (11th Cir. 2026). Because the parties have focused on the interim agreement, the Court does not give a full account of these later orders.

On April 1, 2018, as part of the changes initiated by the *Braggs* litigation, ADOC substituted Wexford for its prior healthcare contractor, MHM, (Doc. 118-1, pp. 2–3; Doc. 119-31, p. 114, ¶ 19), but 99% of the employees from the old company

transferred to the new company, (Doc. 119-32, p. 37, tpp. 10–11), so the people working with the inmates largely stayed the same.

In May 2019, after fifteen suicides in a fifteen-month period, the *Braggs* court granted the class's motion for immediate relief. *Braggs v. Dunn*, 383 F. Supp. 3d 1218 (M.D. Ala. 2019). In this opinion, the *Braggs* court made most of the interim agreement provisions final and awarded other relief.

ADOC appealed at least one of the *Braggs* orders, and the plaintiffs cross-appealed. *See Braggs v. Hamm*, No. 22-10292 (11th Cir. Jan. 26, 2022). The Eleventh Circuit affirmed in part and reversed in part. *Dunn v. Comm'r, Alabama Dep't of Corr.*, 179 F.4th 1277 (11th Cir. 2026). The Eleventh Circuit found that relief was warranted but concluded that the district court's injunction was overly broad in some respects. The Eleventh Circuit noted that for an institutional-level, official-capacity suit like *Braggs*, the district court did not need to find that Commissioner Dunn or Associate Commissioner Naglich were personally deliberately indifferent towards inmates. *Dunn*, 179 F.4th at 1312–14. The Eleventh Circuit also noted that "[t]he Phase 2A Omnibus Remedial Order [wa]s not a 'final' order as contemplated by [28 U.S.C.] § 1291;" the Eleventh Circuit treated the appeal as an interlocutory appeal. *Dunn*, 179 F.4th at 1298.

**<u>Ms. Abrams's lawsuit</u>**

It is undisputed that none of the remaining individual defendants—Jefferson Dunn, Ruth Naglich, or Deborah Crook—knew of Mr. Abrams or were directly involved in his care. (Doc. 119-31, pp. 117–18, 135–36, 142–43, 146; Doc. 118-9, p. 39, tp. 146:5–9; Doc. 115-1, pp. 3–4).

At all relevant times, Jefferson Dunn was ADOC's Commissioner, the top role in ADOC. (Doc. 119-31, p. 109, ¶ 2). Commissioner Dunn oversaw twenty-six facilities housing approximately 20,000 inmates. (Doc. 119-31, pp. 109–10, ¶¶ 3, 5). Commissioner Dunn did not supervise on-the-ground operations directly; he delegated these responsibilities. (Doc. 119-31, p. 110, ¶¶ 4–5). Commissioner Dunn was not qualified to make clinical decisions regarding mental healthcare. (Doc. 118-9, pp. 60, 64, tpp. 232–233, 246–48). Commissioner Dunn took some actions to implement the *Braggs* orders and address deficiencies in mental healthcare, including petitioning the Alabama Legislature for increased funding. (Doc. 119-31, pp. 110–16, ¶¶ 8–24). Commissioner Dunn could not contract for goods and services exceeding $15,000 without legislative approval and/or a bidding process. (Doc. 119-31, p. 112, ¶ 10).

At all relevant times, Ruth Naglich was ADOC's Associate Commissioner of Health Services. (Doc. 119-31, p. 131, ¶ 2). Associate Commissioner Naglich oversaw ADOC's and Wexford staff's provision of health and mental health

services. (Doc. 119-31, p. 131, ¶ 3). Associate Commissioner Naglich did not directly provide or supervise patient care. (Doc. 119-31, pp. 134–35, ¶¶ 14, 18). Associate Commissioner Naglich was not qualified to make clinical decisions regarding mental healthcare. (Doc. 119-31, p. 134, 136, ¶¶ 15, 22–27; Doc. 118-9, pp. 60, 64, tpp. 233, 247–48). Associate Commissioner Naglich did not have authority to unilaterally hire medical, mental health, or ADOC personnel. (Doc. 119-31, p. 135, ¶¶ 19–20). Associate Commissioner Naglich was the principal individual responsible for reviewing the staffing requirements; she recommended, and Commissioner Dunn implemented, an increase in mental health staffing levels. (Doc. 119-31, p. 132, ¶ 5). Associate Commissioner Naglich or her direct reports met with Wexford weekly to discuss concerns and compliance with ADOC's policies and court orders. (Doc. 119-31, p. 134, ¶ 14).

Deborah Crook was ADOC's Director for Mental Health Services. (Doc. 119-31, p. 139, ¶ 2). Before joining ADOC, Director Crook was the regional vice president of operations for MHM Services, Inc., ADOC's prior mental health contractor; Director Crook had held other positions concerning the provision of health or mental health services in Alabama prisons. (Doc. 131-1, pp. 6–9, tpp. 5–8; Doc. 119-31, pp. 139–40, ¶ 2). As ADOC's Director for Mental Health Services, Director Crook primarily updated ADOC's administrative regulations and other policies and forms to conform with court orders from the *Braggs* litigation. (Doc.

119-31, pp. 140–41, 143–44 ¶¶ 5–6, 11; Doc. 131-1, p. 14, tp. 13). Director Crook toured facilities to gauge compliance with ADOC policies, conducted audits of suicide watch and mental health observation, reviewed some suicide risk assessments, and monitored staff training. (Doc. 119-31, pp. 142, 144, ¶¶ 8, 12). She did not review documents about Mr. Abrams before he died. (Doc. 119-31, p. 142, ¶ 9; Doc. 118-9, p. 75, tp. 291). Director Crook is not qualified to provide medical or mental healthcare. (Doc. 119-31, pp. 142–43, ¶ 9; Doc. 118-9, pp. 62, 64, tpp. 238–39, 248). Director Crook reported directly to Associate Commissioner Naglich. (Doc. 119-31, p. 135, ¶ 16).

Barbara Coe was Wexford's Program Director – Mental Health. (Doc. 115-1, pp. 2–3). This was an administrative role; Program Director Coe did not provide or directly supervise patient care. (Doc. 115-2, pp. 7–12, tpp. 14–35). Program Director Coe primarily disseminated the *Braggs* orders and had little involvement in carrying them out; she and/or other senior Wexford officials delegated that task to others. (Doc. 115-2, pp. 7–12, tpp. 14–35).

In the complaint she filed on behalf of Mr. Abrams's estate, Ms. Abrams asserts Eighth Amendment and Alabama state wrongful death claims against each defendant. (Doc. 1). The Court dismissed the wrongful death claims against the ADOC officials after Ms. Abrams failed to address those claims in her response to the ADOC officials' motion to dismiss. (Doc. 58, p. 34). After discovery, the

defendants moved for summary judgment. *See* (Docs. 120, 121, 135) (ADOC officials' joint motion and briefing); Docs. (113, 115, 133) (Ms. Coe's motion and briefing); Docs. (116, 118, 133) (Wexford's motion and briefing).[18] The ADOC officials also moved to exclude the testimony Ms. Abrams's expert witness, Dr. Marcus Patterson. (Docs. 122, 123, 134). Ms. Abrams responded to the defendants' motions for summary judgment, (Doc. 131), and opposed the motion to exclude Dr. Patterson's testimony, (Doc. 132). On June 8, 2026, pursuant to Rule 56(f)(2), the Court ordered supplemental briefing on the state-law claims against Wexford. (Doc. 153; *see also* Docs. 154 (Wexford's initial brief), 157 (Ms. Abrams's response), 158 (Wexford's reply)).

## III.

Ms. Abrams alleges that the ADOC officials violated Mr. Abrams's Eighth-Amendment rights by failing to enact, train officers on, and enforce appropriate suicide-prevention policies. (Doc. 1, p. 11, ¶ 38; Doc. 131, pp. 1–135). "[T]he standard for establishing liability on an Eighth Amendment deliberate-indifference claim" is as follows:

> 1. *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so

[18] Wexford and Barbara Coe filed separate initial briefs but consolidated their replies.

> he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he cannot be found liable under the Cruel and Unusual Punishments Clause if he "responded reasonably to the risk."

*Wade v. McDade*, 106 F.4th 1251, 1261–62 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839, 844–45 (1994)).

The ADOC officials argue that they can be held liable for Mr. Abrams's suicide only if they were aware of Mr. Abrams's suicidal tendencies. (Doc. 121, pp. 38–39; Doc. 135, pp. 8–9). In so arguing, the ADOC officials rely on the Eleventh Circuit's opinion in *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092 (11th Cir. 2005).

In *Cook*, the plaintiff sued a sheriff in his official capacity after the plaintiff's husband committed suicide in a county detention center. *Cook*, 402 F.3d at 1100–02. The plaintiff asserted against the sheriff a § 1983 claim for deliberate indifference and a negligence-based vicarious liability claim under Florida tort law. *Cook*, 402 F.3d at 1100. After a trial on the merits, the district court entered judgment as a matter of law in favor of the sheriff, and the plaintiff appealed. *Cook*, 402 F.3d at 1100. The Eleventh Circuit affirmed the judgment for the sheriff on the § 1983 claim and reversed on the vicarious liability claim. *Cook*, 402 F.3d at 1100.

The Eleventh Circuit explained that the claim against the sheriff in his official capacity was effectively a claim against the county. *Cook*, 402 F.3d at 1115. A

county or municipality is liable only if a "'policy or custom' of the municipality inflicts the injury." *Cook*, 402 F.3d at 1116 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The Eleventh Circuit reasoned that "to succeed on her § 1983 claim," the plaintiff had to "establish that the Sheriff himself, as representative of Monroe County, was deliberately indifferent to the possibility of [the decedent's] suicide, since neither respondeat superior nor vicarious liability exists under § 1983." *Cook*, 402 F.3d at 1115–16.[19]

Relying on the Eleventh Circuit's *en banc* statement in *Tittle* that a defendant must have "notice of the suicidal tendency of *the* individual whose rights are at issue in order to be held liable for the suicide of that individual," the *Cook* court held that "even if [the plaintiff] had established the Sheriff's deliberate indifference toward suicidal inmates in general[,] . . . this would not suffice to demonstrate the foreseeability of [*the decedent's*] suicide and to hold the Sheriff liable under § 1983."

---

[19] Although *Cook* was not an individual capacity suit, it provides meaningful guidance for individual capacity suits because *Cook* focused solely on whether "the Sheriff himself . . . was deliberately indifferent," *Cook*, 402 F.3d at 1115–16. More generally, the requirements for supervisory liability are "analogous" to those for municipal liability, *see Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir. 1990) ("Because a supervisor's orders and directions are tantamount to official policy in the eyes of a subordinate, we find the analogous situation of municipal liability . . . to be helpful in determining whether a supervisor was deliberately indifferent to an inmate's psychiatric needs."); *Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994) (similar), though in the context of injunctive relief, the Eleventh Circuit has rejected the idea that "that the court should have focused on [the] deliberate indifference [of the official sued in their official capacity], instead of the institution's historical indifference," *LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993); *see also Dunn v. Comm'r, Alabama Dep't of Corr.*, 179 F.4th 1277, 1313 (11th Cir. 2026) (same).

*Cook*, 402 F.3d at 1117 (first emphasis from *Tittle*; second emphasis from *Cook*) (quoting *Tittle v. Jefferson Cnty. Comm'n*, 10 F.3d 1535 (11th Cir. 1994)). The *Cook* court rejected the proposition that it would suffice if the sheriff exhibited "deliberate indifference toward a *class of suicidal detainees to which [the decedent] belongs,* and that the deliberate indifference toward that class caused constitutional harm to [the decedent] individually." *Cook*, 402 F.3d at 1117 (emphasis in *Cook*). The Eleventh Circuit stated that "no negligence on the part of [the] employees could alter the fact that the Sheriff—the sole defendant in this § 1983 action—himself had no actual knowledge that [the decedent] might take his own life." *Cook*, 402 F.3d at 1116.[20]

In this Court's opinion denying the ADOC officials' motion to dismiss, the Court distinguished *Cook* because *Cook* "was decided on a full evidentiary record." (Doc. 53, p. 25). The evidentiary record that the parties have developed indicates that none of the remaining ADOC defendants knew that Mr. Abrams was suicidal. (Doc. 119-31, pp. 117–18, 135–36, 142–43, 146; Doc. 118-9, pp. 39, tp. 146:5–9). Ms. Abrams does not dispute this. (*See* Doc. 131, pp. 1 (submitting "undisputed facts, in addition to those set out by defendants in their brief"), 6 (stating that "this

---

[20] Only the claims against the sheriff were at issue on appeal, so the Eleventh Circuit did not consider whether the detention center's employees were deliberately indifferent. Still, the *Cook* court noted that the plaintiff had "presented no evidence that [the decedent] had previously attempted suicide or had ever been considered a suicide risk." *Cook*, 402 F.3d at 1116.

case is fundamentally about prison *conditions* leading to suicide rather than about whether any of the defendants knew that Roderick Abrams himself was at risk, the essence of the individual defendants' defenses.")). Therefore, under *Cook*, the remaining individual ADOC defendants are entitled to summary judgment.

There is tension between *Cook*, published Eleventh Circuit and Supreme Court precedent pre-dating *Cook*, and the Eleventh Circuit's *en banc* opinion in *Wade*, which reaffirmed that prior Supreme Court precedent. District courts within the Eleventh Circuit have split on the validity or applicability of *Cook*. *Compare Keith v. Naglich*, No. 17-cv-01437, 2018 WL 513344, at *7–8 (N.D. Ala. Jan. 23, 2018) (Kallon, J.) (applying *Cook* to dismiss Eighth Amendment claim against Associate Commissioner Naglich because she lacked knowledge of decedent's suicidality), *with Head v. Dunn*, No. 20-cv-00132, 2021 WL 2003554, at *7 (M.D. Ala. May 19, 2021) (MTD) (Watkins, J.) (declining to follow *Cook* based on conflict with prior precedent and denying motion to dismiss claims against Commissioner Dunn and Associate Commissioner Naglich).

The Eleventh Circuit has explained that even "serious tension" may not equate with a violation of the prior panel rule or abrogation. *United States v. Sanders*, 461 Fed. Appx. 854, 856 (11th Cir. 2012). The Eleventh Circuit's "prior-panel-precedent rule dictates that 'a prior [Eleventh Circuit] panel's holding is binding on all subsequent panels [and district courts within the Eleventh Circuit] unless and

until it is overruled or undermined to the point of abrogation by the Supreme Court or by the [Eleventh Circuit] sitting en banc.'" *TL90108 LLC v. Ford*, 147 F.4th 1351, 1358 (11th Cir. 2025) (internal citation omitted). The "prior-precedent rule also requires [courts] to 'follow the reasoning behind a prior holding if [they] cannot distinguish the facts or law of the case under consideration—even if the present case does not involve precisely the same issue.'" *Sabal Trail Transmission, LLC v. 18.27 Acres of Land*, 59 F.4th 1158, 1164 (11th Cir. 2023). In the event an intra-circuit conflict develops, future panels and district courts must "if at all possible, distill from apparently conflicting prior panel decisions a basis of reconciliation and . . . apply that reconciled rule." *O'Neal v. Am. Shaman Franchise Sys., Inc.*, 166 F.4th 1274, 1282 (11th Cir. 2026) (quoting *United States v. Hogan*, 986 F.2d 1364 (11th Cir. 1993)).

The Eleventh Circuit strongly favors reconciling later *en banc* or Supreme Court cases with earlier panel decisions when possible:

> For a Supreme Court decision to undermine panel precedent to the point of abrogation, the decision must be clearly on point and clearly contrary to our earlier decision. If the Supreme Court never discussed our precedent and did not otherwise comment on the precise issue before the prior panel, our precedent remains binding. Indeed, the Supreme Court decision must demolish and eviscerate each of our decision's fundamental props. An intervening decision that merely weakens the holding of an earlier panel is not sufficient to abrogate that holding. Put another way, even if the reasoning of an intervening high court decision is at odds with a prior appellate court decision, that does not provide the appellate court with a basis from departing from its prior decision.

> So long as our precedent's holding retains at least one valid basis or rationale, it remains binding.

*TL90108*, 147 F.4th at 1359–60 (internal citations, quotation marks, and alterations omitted).

In *Wade*, the Eleventh Circuit granted rehearing *en banc* to answer the following question: "What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?" *Wade*, 106 F.4th at 1253. Prior panel opinions had "flip-flop[ped] between two competing formulations" of the *mens rea* element: "more than *mere* negligence" and "more than gross negligence." *Wade*, 106 F.4th at 1254 (emphasis in *Wade*). The *en banc* court eliminated the "negligence-based formulations" and returned to the "subjective recklessness as used in the criminal law" standard the Supreme Court articulated in *Farmer*. *Wade*, 106 F.4th at 1255–57, 1261 (quoting *Farmer*, 511 U.S. at 839).

Criminal recklessness typically does not require knowledge of a specific victim. In *Farmer*, for example, the Supreme Court favorably cited a case "holding that a defendant may be held criminally liable for injury to an unanticipated victim." *Farmer*, 511 U.S. at 844 (citing *State v. Julius,* 408 S.E.2d 1, 10–11 (W. Va. 1991)). Extrapolating from *Julius* and other cases, the Supreme Court held that a prison official may not "escape liability for deliberate indifference [to inmate-on-inmate violence] by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be

assaulted by the specific prisoner who eventually committed the assault. . . . [I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. Generally, for municipalities and supervisory defendants to be held liable for a constitutional violation, the Eleventh Circuit has not required proof of the defendant's knowledge of and deliberate indifference to the plaintiff himself. *See, e.g.*, *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (holding—without considering whether the director of city bureau of corrections knew of the individual plaintiff—that both the city and the director could be liable for understaffing pre-trial detention center, while also noting that individual officers would not be liable if the understaffing prevented them from doing their jobs properly); *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (collecting cases stating that a plaintiff may state a claim based on "generalized risk[s]" from "confinement in a prison where violence and terror reign" and where "serious inmate-on-inmate violence was the norm").

Neither *Farmer* nor *Wade* concerned suicide or other forms of self-harm. In *Tittle*, the Eleventh Circuit held that a defendant must have "notice of the suicidal tendency of *the* individual whose rights are at issue in order to be held liable for the suicide of that individual." *Cook*, 402 F.3d at 1105, 1117 (emphasis from *Tittle*)

(quoting *Tittle*, 10 F.3d at 1539). *Tittle* and the line of panel opinions predating it appear to have been concerned that courts might require prison officials to act as if "all prisoners . . . are substantially likely to attempt suicide." *Tittle*, 10 F.3d at 1540–41 (citations omitted) ("[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners. . . . The plaintiffs cite no authority that supports the argument that the occurrence of two suicides and twenty-seven attempted suicides in the jail requires County officials to conclude that all prisoners of the Jefferson County Jail are substantially likely to attempt suicide."); *see also, e.g.*, *Popham v. City of Talladega*, 908 F.2d 1561, 1563–65 (11th Cir. 1990) (noting that allegations "related to the failure to train jail personnel to screen detainees for suicidal tendencies" had been "rejected by other courts" and plaintiff "cite[d] no cases for the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times"). Because "[a] prison custodian is not the guarantor of a prisoner's safety," *Popham*, 908 F.2d at 1564, the *Tittle* court reasoned that "deliberate indifference can only be established where a plaintiff demonstrates a 'strong likelihood, rather than a mere possibility,' that suicide would result from a defendant's actions or inaction." *Tittle*, 10 F.3d at 1540 (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)). In other words,

jailors have no duty to take suicide precautions for inmates who are not known to be suicidal.[21] *Cook* is grounded in similar suicide-specific considerations.[22]

In *Cook*, the Eleventh Circuit did not mention its opinion in *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). Mr. Greason committed suicide after his psychiatric medication was abruptly discontinued, despite letters from mental health professionals at a prior facility stating that Mr. Greason was suicidal and his medication should not be discontinued. *Greason*, 891 F.2d at 831–33. The Eleventh Circuit affirmed the district court's denial of summary judgment to the warden, clinical director, and various medical personnel. *Greason*, 891 F.2d at 834–40. In holding that the warden could be liable, the Eleventh Circuit reasoned that the warden knew or should have known that there were insufficient medical staff to meet inmates' needs, knew of a previous incident where a different inmate engaged in

---

[21] *Tittle*'s concurrence recognized that the majority's broad language could be read to preclude claims of deliberate indifference toward groups of individuals, and suggested a narrower rule that "[i]f the authority responsible for maintaining safe jail conditions *knows* that inmates are using a particular feature of the jail to commit suicide time after time, the Constitution demands corrective action, absent overriding, legitimate governmental interests." *Tittle*, 10 F.3d at 1546 (Kravitch, J., concurring). The concurrence would have ruled for the defendant on the grounds that the plaintiff had failed to establish that government officials "had actual knowledge . . . that inmates were attempting suicide at a frightening rate, much less that the horizontal pipes had become their suicide-tool of choice." *Tittle*, 10 F.3d at 1542 (Kravitch, J., concurring).

[22] As noted, in *Cook*, there was "no evidence that [the decedent] had previously attempted suicide or had ever been considered a suicide risk" by jail personnel. *Cook*, 402 F.3d at 1116. The parties have not cited, and the Court has not found, an Eleventh Circuit case where there was an inmate known by lower-level officials to be suicidal, a municipality or supervisory defendant knowingly authored or maintained policies that would be dangerous to every inmate known to be suicidal, and the court held that the supervisory official or municipality was not liable because they themselves lacked knowledge of that particular inmate's suicidality.

self-harm after his medication was abruptly discontinued, and yet did not attempt to remedy the understaffing problem. *Greason*, 891 F.2d at 839–40. The letters from the prior facility regarding Mr. Greason's suicidality were sent to a different defendant, there is no indication from the opinion that the warden saw the letters, and the opinion does not state that the warden knew of Mr. Greason's suicidality.

Still, as the ADOC officials note, (Doc. 121, pp. 42–44), in its conclusion on the warden's liability, the *Greason* court stated that the warden "was aware of the same essential facts that were also apparent to [the clinical director] and [the mental health director]." *Greason*, 891 F.2d at 840. The clinical director and mental health director knew of Mr. Greason's suicidality. *Greason*, 891 F.2d at 837–39. Given the Eleventh Circuit's direction that courts must "distill from apparently conflicting prior panel decisions a basis of reconciliation," *O'Neal*, 166 F.4th at 1282, the Court distinguishes *Greason* from *Cook* because the warden in *Greason* had some knowledge of the prisoner's suicidality.[23]

Therefore, per *Cook*, the Court grants Commissioner Dunn's, Associate Commissioner Naglich's, and Director Crook's motion for summary judgment because it is undisputed that none of these officials had knowledge of Mr. Abrams

[23] At least one post-*Farmer* Eleventh Circuit opinion casts doubt on whether *Greason* is consistent with the criminal recklessness standard in *Farmer*. *See Campbell v. Sikes*, 169 F.3d 1353, 1365 n.10 (11th Cir. 1999).

or his suicidality. The Court does not address other issues and arguments concerning this motion, such as the potential preclusive effect of the *Braggs* liability opinions or remedial orders. Because the Court has resolved the ADOC officials' motion for summary judgment without considering Dr. Patterson's expert testimony, the ADOC officials' motion to exclude Dr. Patterson's testimony is moot.

***

Turning to Wexford, Wexford is a private entity, but "[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity, state action is present." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (addressing private medical provider's contract with Duval County Jail); *see also Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (citing *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)) (stating that a private entity "that contracts to provide medical services to inmates performs traditional state functions"). "[Section] 1983 does not provide for liability under a theory of *respondeat superior*." *Roy*, 53 F.4th at 1347 (alteration in *Roy*) (citing *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010)). Instead, a plaintiff must show that the contractor's "policy or custom" caused the plaintiff's injury. *Roy*, 53 F.4th at 1347 (citing *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)). "In the absence of an official policy endorsing a constitutional violation, a plaintiff must show: (1) that the [entity] had a custom or practice of permitting

such a violation; and (2) that this custom or practice was the 'moving force' behind the violation." *Roy*, 53 F.4th at 1347 (quoting *Craig*, 643 F.3d at 1310). "Proof of a single incident of an unconstitutional activity is insufficient to show a custom, which must be such 'a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.'" *Roy*, 53 F.4th at 1347 (quoting *Craig*, 643 F.3d at 1310).

Ms. Abrams has not met her burden of showing that Wexford had a policy or custom of engaging in similar constitutional violations. Ms. Abrams's expert, Dr. Patterson, testified that he either did not review Wexford's policies and trainings, or that he thought they (and the ADOC's policies and trainings) were "solid." (Doc. 118-9, pp. 31–32, 43–44, 57, 62, 69, 76–78, tpp. 115–21, 165–66, 219–20, 239–40, 266–68, 297–98, 302–03). Dr. Patterson did not review information on suicides besides Mr. Abrams's, (Doc. 118-9, pp. 62–63, tpp. 240–45), and he testified that not all prison suicides were preventable even when appropriate policies are followed, (Doc. 118-9, p. 60, tp. 231:1–10).[24] Ms. Abrams has not cited evidence from which

---

[24] At the end of the deposition, the following exchange took place between Ms. Abrams's attorney and Dr. Patterson:

> Q. And so the fact that at least ten, maybe a dozen other suicides had occurred prior to Mr. Abrams, how does that impact your assessment as to whether or not the policies in place at that time were adequate?
>
> MR. CRANFORD: Object to the form.

a jury could infer that other suicides at the jail were caused by a pattern of wrongdoing by Wexford employees, that Wexford knew of this pattern, and that Wexford tacitly condoned it despite knowing of serious risks to inmates.

To the extent that the record before the *Braggs* court would support such findings, the evidence in *Bragg* is not in the record here, and collateral estoppel does not apply here. Collateral estoppel ordinarily applies only to parties to prior litigation, and Wexford was not a party to the *Braggs* litigation. Wexford's contract with ADOC to provide healthcare in accordance with the legal standards and court orders that govern ADOC's conduct does not change the estoppel calculus. (Doc. 157, pp. 14–15). The Supreme Court has identified narrow exceptions to the rule against nonparty issue preclusion: (1) when the nonparty agreed to be bound by the outcome in future litigation; (2) when the nonparty has certain "substantive legal

---

> A. It would suggest that -- that they weren't, given the frequency and the -- the pace of which the suicides -- completed.
>
> Q. And would you say that that indicates some type of management failure or deficiency?
>
> MR. CRANFORD: Object to the form.
>
> A Yes. It usually starts top down in terms of enforcement and policy.

(Doc. 118-9, p. 82, tp. 321:4–16). Dr. Patterson did not articulate how the policies or management were deficient or give a factual basis for his assertion other than the existence of multiple suicides. Dr. Patterson indicated his belief that supervisors are always responsible in a moral sense for the failure of systems they oversee, (Doc. 118-9, pp. 57–62, 82–83, tpp. 219–239, 321–22). This is a *respondeat superior* theory that cannot form the basis of Wexford's alleged liability. *Roy*, 53 F.4th at 1347.

relationships" with the party to the judgment, typically grounded in property law, such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"; (3) when the nonparty was "'adequately represented by someone with the same interests who was a party' to the suit," such as "properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries," (4) when the nonparty "'assumed control' over the litigation"; (5) when the nonparty is a "proxy" for the party bound by the judgment; and (6) when a "special statutory scheme . . . expressly foreclose[s] successive litigation by nonlitigants if the scheme is otherwise consistent with due process," such as in the case of bankruptcy and probate proceedings. *Taylor v. Sturgell*, 553 U.S. 880, 893–96 (2008) (internal alterations omitted) (citations omitted). The Supreme Court has rejected a broader "virtual representation" theory of collateral estoppel. *Taylor*, 553 U.S. at 900–01, 904 ("[W]e disapprove the theory of virtual representation . . . . The preclusive effects of a judgment in a federal-question case decided by a federal court should instead be determined according to the established grounds for nonparty preclusion described in this opinion.").

Wexford's contractual relationship with ADOC, which began mid-way through the *Braggs* litigation, does not fall into one of these categories. Though Wexford agreed to supply services to ADOC in accordance with the legal requirements placed on ADOC, Wexford did not agree to be bound by the *Braggs*

court's legal or factual findings in future litigation brought by parties like Ms. Abrams. Wexford's contractual relationship with ADOC is not like the property-based legal relationships that courts have found to be a basis for collateral estoppel. Wexford did not "assume control" over *Braggs* litigation, and Wexford is not acting as a "proxy" for ADOC in this litigation. And there is no "special statutory scheme" that would impose a preclusive effect on Wexford. Accordingly, Wexford is not bound by the *Braggs* findings.

Ms. Abrams argues, (Doc. 157, pp. 15–16), that the *Braggs* "Phase 2A Remedial Opinion" may be considered under Rule 703 of the Federal Rules of Evidence, which allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed," even if those facts are not otherwise admissible, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." FED. R. EVID. 703. In his expert report, the only time Dr. Patterson mentioned *Braggs* is in the "documents and materials reviewed" section, where he indicates that he reviewed the interim order and agreement and the May 4, 2019 opinion. (Doc. 115-3, p. 7).[25] In his deposition, Dr. Patterson stated that he had a "[t]op level, but not in depth" understanding of "the process for the Braggs litigation," (Doc. 118-9, p. 65, tpp.

[25] Dr. Patterson also lists some deposition transcripts in his materials reviewed section, but it is unclear when and in what action those depositions were taken.

252–53), and he had not reviewed information on suicides besides Mr. Abrams's, (Doc. 118-9, pp. 62–63, tpp. 240–45). Accordingly, the *Braggs* opinions are not admissible under Rule 703 because they are not necessary to evaluate Dr. Patterson's opinions.[26]

Ms. Abrams also argues she may rely on the *Braggs* orders because she has "reserved 'the right to call, as a non-retained expert witness, any expert witness with first-hand knowledge of the Braggs litigation or who may have provided testimony to the Court in the Braggs litigation.'" (Doc. 157, p. 16) (internal brackets omitted).[27] At the summary judgment stage, a party "must show by depositions, documents, affidavits, interrogatory answers, or other materials that specific facts exist demonstrating a genuine issue for trial." *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013). For Ms. Abrams to rely on testimony or documentary evidence presented to the *Braggs* court, she had to place those materials in the record before this Court and explain their significance in her opposition brief. As noted, the *Braggs* evidence is not in the summary judgment record here.

---

[26] In certain circumstances, a district court may take judicial notice of or otherwise admit into evidence the fact that a court order was in effect, but the court may not take notice of or admit into evidence the factual findings of another court unless collateral estoppel or res judicata apply. *See United States v. Jones*, 29 F.3d 1549, 1553–54 (11th Cir. 1994) (rejecting argument that findings of prior court could be admitted under Fed. R. Evid. 201(b) or 803(8)).

[27] Ms. Abrams mistakenly cites Doc. 132 for this statement, which she identifies as her expert disclosure. Ms. Abrams's expert disclosure with this statement appears at Doc. 115-3, p. 2.

In addition to her Eighth Amendment claim, Ms. Abrams asserts a state-law wrongful death claims against Wexford. (Doc. 1, p. 12, ¶¶ 43–45). Under Alabama law, generally, there is no duty to prevent others from committing suicide; suicide is a superseding cause that breaks the chain of causation from any negligence of the defendant. *See Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1275–76, 1278 (Ala. 1993) ("Assuming that [the defendant] acted negligently and created a dangerous condition by leaving the handgun loaded and accessible, [his friend's] subsequent act of *intentionally* and *deliberately* shooting himself in the head was unforeseeable as a matter of law and was sufficiently culpable to supersede the defendants' negligence as the proximate cause of [his friend's] death . . . [W]e do not expect the ordinary person to be able to predict, much less guard against and prevent, another person's deliberate and self-destructive actions.").

The Alabama Supreme Court has recognized an exception for healthcare providers, prison officials, and other persons with a "special custodial relationship" over a detainee or patient. *Gilmore*, 613 So. 2d at 1276–77. These individuals have a duty to take reasonable measures to prevent those in their care from committing suicide if the suicide is foreseeable. *See, e.g.*, *Patton v. Thompson* (*Patton I*), 958 So. 2d 303 (Ala. 2006) ("Prison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody. This duty generally does not include protection from self-inflicted injury or death. However, the duty

can include protection from self-inflicted injury or death when the prison officials knew or should have known that the prisoner might harm himself.”).[28]

Whether a suicide was foreseeable to a custodian is a question of law for a court to decide. *See, e.g.*, *Keebler v. Winfield Carraway Hosp.*, 531 So. 2d 841, 844 (Ala. 1988) (citation omitted) (noting, in case against medical provider whose patient committed suicide after release, that foreseeability is part of the issue of duty, and “the question of whether a legal duty exists is essentially a question of law for the court”); *City of Crossville v. Haynes*, 925 So. 2d 944, 950 (Ala. 2005) (citation omitted) (same in context of jail suicide).

“The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated that the deceased would attempt to harm himself.” *Bryant v. Carpenter*, 322 So. 3d 1052, 1057 (Ala. 2020) (citing *Popham v. City of Talladega*, 582 So. 2d 541, 543 (Ala. 1991)). The Alabama Supreme Court has determined that

[28] The Alabama Supreme Court has noted two other possible exceptions to the general rule against liability for suicide, neither of which applies here. The first is when the defendant creates an “uncontrollable impulse” to commit suicide in the decedent, i.e., causes “a delirium, frenzy or rage, during which the deceased commits suicide ‘without conscious volition to produce death.’” *Prill v. Marrone*, 23 So. 3d 1, 8 (Ala. 2009) (citation omitted). The second exception is when the defendant sexually assaulted the victim, and the sexual assault caused the suicide. *Rondini v. Bunn*, 338 So. 3d 749, 752–54 (Ala. 2021) (distinguishing *Gilmore*). This exception is based on the general rule that perpetrators of intentional torts, unlike those who are negligent, are liable for all harm they cause whether or not that harm is foreseeable, but the Alabama Supreme Court left “for another day” whether other intentional torts besides sexual assault could support liability for suicide. *Rondini*, 338 So. 3d at 752–54 (Ala. 2021).

"foreseeability of a decedent's suicide is legally sufficient only if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt." *Bryant*, 322 So. 3d at 1057 (citing *Popham*, 582 So. 2d at 543).

"[I]t is manifested suicidal proclivities," not just the presence of risk factors, "that potentially gives rise to a duty to prevent a suicide." *Bryant v. Carpenter*, 322 So. 3d 1052, 1057–60 (Ala. 2020) (underlining in *Bryant*) (finding that detainee's erratic behavior and recent history of sexual assault were not enough to make his suicide foreseeable to jail employees when detainee did not state he was suicidal and the jail employees were unaware of any prior suicide attempts); *see also Gunter v. Advanced Corr. Healthcare, Inc.*, 844 Fed. Appx. 189, 194 (11th Cir. 2021) (ruling that nurses and medical contractor company were not liable for detainee's suicide when there was no evidence detainee exhibited or had a history of suicidal tendencies, even if the nurses knew he was booked for drugs and "knew or should have known" that "the frequency of suicide attempts is substantially higher among patients with a substance use disorder" and the detainee "was likely to experience significant psychological distress during detoxification"); *Haynes*, 925 So. 2d 944, 953–54 (Ala. 2005) (finding detainee's suicide was not foreseeable to city employees when detainee "had mentioned to one of the officers that he had had a nervous breakdown and that a tornado had destroyed his business," "had soiled his

pants when he first came to the Crossville city jail," and "had asked on more than one occasion for some unidentified medication"). Suicide threats alone may not make a suicide foreseeable if the decedent had a history of false suicide threats, and there was no other reason to think the decedent was suicidal. *See Smith v. King*, 615 So. 2d 69, 71, 73 (Ala. 1993) (ruling that suicide was not reasonably foreseeable to counselors and qualified mental health professionals at state-owned mental health facility, even though the decedent had threatened self-harm several times, when the decedent had never acted on the threats, and "[t]he record indicate[d] that such threats are sometimes used as a manipulative device, . . . [and the decedent] had admitted that he sometimes used such threats to manipulate his parents and the staff at the [mental health facility].").

A healthcare provider or other custodian generally is not responsible for a detainee who is released into another's custody. *See, e.g.*, *Rondini*, 338 So. 3d at 752 (noting duty may arise when "when the decedent is being held in a prison or hospital at the time of his or her death"); *Keebler*, 531 So. 2d at 845 (quoting *Mobile Infirmary v. Eberlein,* 119 So.2d 8, 17 (Ala. 1960)) (noting general rule that if a physician knows his patient is in a dangerous condition, the physician "must either render such attention himself or see that some other competent person does so," but finding that emergency room physician's release of patient into custody of police was not improper when suicide was not foreseeable to physician at the time of the

release); *Richards v. United States*, 67 F. Supp. 2d 1321, 1324 (M.D. Ala. 1999) (holding law enforcement officer could not be held liable for suicide that occurred after "he relinquished . . . custody [of the decedent] to other law enforcement officers and eventually to the youth services defendants," but noting that "the court has not considered the question of whether the custodial relationship requirement may be met if a person is able to free himself from custody through some fault or negligence of a defendant").

If the detainee's suicide was foreseeable to a custodian when the custodian released the detainee, the custodian may be liable if the custodian released the detainee or transferred the detainee without proper precautions. For example, in *Foster v. Charter Med. Corp.*, 601 So. 2d 435 (Ala. 1992), the decedent, who had a history of suicide attempts, was admitted to the defendant mental health facility after being diagnosed as depressed and suicidal. *Foster*, 601 So. 2d at 435–36, 440. The facility placed the decedent on supervised release with a friend. *Foster*, 601 So. 2d at 436–37. While on supervised release, the decedent told his friend that he planned to commit suicide by shooting himself, hanging himself, or jumping from his apartment; "cried hysterically[;]" and "was so despondent that . . . [the friend] remained with [the decedent] past visiting hours" after returning the decedent to the facility. *Foster*, 601 So. 2d at 437–38. The mental health facility did not conduct a post-release interview with the friend, which an expert testified was necessary to

meet the standard of care; the facility also ignored concerning behavior by the decedent and requests from the decedent's family and friend to check on the decedent. *Foster*, 601 So. 2d at 436–38. The next day, without reviewing important information that had been documented, the facility released the decedent on unsupervised release; the decedent shot himself four days later. *Foster*, 601 So. 2d at 437–38. The Alabama Supreme Court rejected the argument that the facility could not be held liable because the decedent was not in their care when he committed suicide, holding that "[t]he question to be resolved is whether, *while [the decedent] was in their care,* the defendants breached a duty that proximately caused his death, which, in this instance, happened to occur some time after he had left their care." *Foster*, 601 So. 2d at 440 (italics in original).

Here, Wexford placed Mr. Abrams on suicide watch on December 21, 2018 because he said he was suicidal and was acting erratically. Mr. Abrams said during his December 2018 suicide watch that he had only claimed to be suicidal to get help with other issues, (Doc. 118-5, p. 54), but the Court accepts for the purposes of this motion that Mr. Abram's suicide was reasonably foreseeable when Wexford placed him on suicide watch.

Logically, someone who is suicidal at a point in time is not necessarily suicidal at all times, and the law does not require healthcare providers to treat them as such. Caselaw focuses on whether the healthcare provider could foresee the detainee's

imminent suicide when the provider released the detainee or while they had him in custody, i.e., whether the healthcare provider knew or should have known that the detainee was suicidal at that point in time. If a detainee's suicide was foreseeable, courts then consider whether the defendant took adequate preventative measures during the crisis period, and whether the defendant's failure to take precautions proximately caused or allowed the suicide. *See, e.g.*, *Patton I*, 958 So.2d at 312–13 (agreeing "that a medical-malpractice action based on a patient's suicide is different from a general medical-malpractice action because in the former the patient's death is at his own hands," but explaining that proximate cause is a separate requirement from foreseeability); *Breland*, 69 So. 3d at 824–25 ("The duty of health-care providers, when a patient may attempt to harm himself, contemplates the reasonably foreseeable occurrence of self harm, and such self-destructive conduct involves the necessity of precautions or safeguards to attempt to prevent such harm."). Accordingly, the Court examines whether Wexford negligently released Mr. Abrams, and whether Wexford's alleged negligence proximately caused Mr. Abram's suicide. To answer these questions, the Court first must examine Alabama's rules on expert testimony against healthcare providers.

The Alabama Medical Liability Act applies in actions against health care providers for alleged breaches of a standard of care. ALA. CODE § 6-5-540 et. seq. A "health care provider" is "[a] medical practitioner, dental practitioner, medical

institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." ALA. CODE § 6-5-542. Section 6-5-481 in turn defines the relevant terms as follows:

> (1) MEDICAL PRACTITIONER. Anyone licensed to practice medicine or osteopathy in the State of Alabama, engaged in such practice, including medical professional corporations, associations, and partnerships.
>
> . . .
>
> (5) PHYSICIAN. Any person licensed to practice medicine in Alabama.
>
> . . .
>
> (8) OTHER HEALTH CARE PROVIDERS. Any professional corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services.

ALA. CODE § 6-5-481. Wexford and its personnel all qualify as health care providers under the AMLA.

When a plaintiff sues a health care organization, a court must focus "on the individual practitioner whose specific action is alleged to have fallen below the standard of care." *Husby v. S. Alabama Nursing Home*, Inc., 712 So. 2d 750, 753 (Ala. 1998). Under the AMLA, to establish a claim against a health care provider, a plaintiff generally must present expert testimony from a "similarly situated health care provider[]." *Glenn v. Corizon L.L.C.*, No. 21-10021, 2022 WL 1041338, at *3 (11th Cir. Apr. 7, 2022) (quoting ALA. CODE § 6-5-548); *see also McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004) (citation omitted) (explaining that

these sort of competency requirements "are often intimately intertwined with a state substantive rule" and apply in addition to the Daubert standard). "[T]he plaintiff ordinarily must present expert testimony from a similarly situated health-care provider as to (1) the appropriate standard of care, (2) a deviation from that standard of care, and (3) a proximate causal connection between the defendant's act or omission constituting the breach and the injury sustained by the plaintiff." *Collins v. Herring Chiropractic Ctr., LLC*, 237 So. 3d 867, 870 (Ala. 2017) (internal brackets and quotation marks omitted) (citation omitted); *see also* ALA. CODE 6-5-542(2) (defining "breach of the standard of care" as "the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death").

When a defendant healthcare provider is a specialist, meaning a provider who "is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist," ALA. CODE § 6-5-548(c), the plaintiff must provide expert evidence in that area of specialty. To determine whether a healthcare provider is a specialist, a court must "look to . . . the specialty or discipline or school of practice that covers the area of the alleged breach," not whether the statutory criteria are met in the abstract. *Medlin v. Crosby*, 583 So. 2d 1290, 1294 (Ala. 1991), *superseded by statute on other grounds*, The Alabama Medical Liability Act of 1996, Ala. Acts 96-511, p. 650

(codified at ALA. CODE §§ 6-5-548, 6-5-549). Accordingly, "[a] court must determine (1) the standard of care the plaintiff alleges the defendant breached; (2) whether the defendant who is alleged to have breached the standard of care is a specialist in the area of care in which the breach is alleged to have occurred; and (3) whether the expert is qualified under the criteria set out in the relevant [subsection for specialists or nonspecialists]." *Ex parte Waddail*, 827 So. 2d 789, 793 (Ala. 2001).

To be similarly situated to a nonspecialist, an expert must "meet[] all of the following qualifications:"

> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
>
> (2) Is trained and experienced in the same discipline or school of practice.
>
> (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

ALA. CODE § 6-5-548(b). To be similarly situated to a specialist, an expert must meet these requirements, as narrowed to the specialty:

> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
>
> (2) Is trained and experienced in the same specialty.
>
> . . .
>
> (4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred.

ALA. CODE § 6-5-548. In addition, under ALA. CODE § 6-5-548(c)(3) and (e), if the alleged breach was within the defendant provider's specialty, to be "similarly situated," the expert must be "certified by the same American board in the same specialty." ALA. CODE § 6-5-548(c)(3), (e). "The fact that [two boards] may have the same purpose, that they may certify providers for the same procedures, or that they may require the same qualifications would be irrelevant." *Johnson v. Price*, 743 So. 2d 436, 438 (Ala. 1999) (finding doctor with D.O. degree could not testify against doctor with M.D. as to standard of care for surgery, even if both were certified and equally qualified as surgery specialists, when the two degree types were certified by different boards); *see also, e.g.*, *Hegarty v. Hudson*, 123 So. 3d 945, 950–51 (Ala. 2013) (OBGYN could not testify against family medicine specialist who performed c-section, even though c-section was within OBGYN specialty, because c-sections were also within family medicine specialty and the two specialties are certified by different boards); *Dale v. Kolb*, 61 So. 3d 251, 256 (Ala. 2010) (finding M.D. could not testify against D.O. as to standard of care for issue within family medicine specialty, even though both doctors were certified to practice in family medicine specialty by their respective degree type's boards).

Here, Dr. Mary Catherine Thrower, M.D., a board-certified psychiatrist, approved downgrading Mr. Abrams from acute to non-acute suicide watch. (Doc. 118-1, p. 10; Doc. 118-5, p. 33; Doc. 154, pp. 15–16). Dr. Brian Gawronski, M.D.,

another board-certified psychiatrist, approved the discharge of Mr. Abrams from non-acute suicide watch and Wexford's custody. (Doc. 118-1, p. 14; Doc. 118-5, p. 55; Doc. 154, pp. 18–19). In addition to Drs. Thrower and Gawronski, Amber Fox, an associate licensed mental health counselor; J. Thomas, a licensed medical social worker; and several nurses were involved in Mr. Abrams's care and eventual release from Wexford's custody. (*See, e.g.*, Doc. 118-1, pp. 5, 15–17; Doc. 118-5, pp. 2–3, 10–12, 55, 62–63; Doc. 118-9, p. 48, tp. 184:4–6; Doc. 119-32, p. 45, 62, 70, tpp. 42–45, 112–113, 144).[29] Ms. Abram's expert, Dr. Patterson, PysD, is a licensed psychologist with a masters degree in forensic psychology and a clinical doctorate, but no medical degree. (Doc. 118-9, pp. 10–15, 81, tpp. 33–50, 314–17).

Ms. Abrams stated that she "does not concede that § 6-5-548(e) bars Dr. Patterson from testifying about the specific decisions of Dr. Thrower (approving the downgrade from acute to non-acute suicide watch) or Dr. Gawronski (approving discharge from suicide watch and Wexford's custody)," (Doc. 157, p. 9), but Ms. Abrams has not argued that ALA. CODE § 6-5-548(e) does not bar Dr. Patterson's testimony as to Dr. Thrower and Dr. Gawronski. Dr. Thrower and Dr. Gawronski were acting as psychiatrists when they downgraded Mr. Abrams from suicide watch and later approved his discharge. Psychiatry is a medical specialty, and Ms. Abrams

[29] Not all signatures were legible, and the parties have not pointed to any interrogatories or other sources giving a full list of those involved in Mr. Abrams's care.

has not disputed that Dr. Thrower and Dr. Gawronski qualify as specialists in the field of psychiatry. Dr. Patterson is not trained or board-certified in psychiatry, so he cannot meet the requirements of ALA. CODE § 6-5-548(c)(3) and (e) to testify against Dr. Thrower and Dr. Gawronski, even though he may be qualified to make determinations on whether it is appropriate to discharge patients from suicide watch.

Ms. Abrams argues that even if Dr. Patterson is not qualified to testify against Dr. Thrower and Dr. Gawronski, the Court should consider Dr. Patterson's testimony regarding "institutional and administrative failures," (Doc. 157, pp. 7–12), and Dr. Patterson's testimony on the actions or inaction of non-specialist healthcare providers such as Ms. Fox or Mr. Thomas, (Doc. 157, pp. 5–7, 9–11). In some circumstances, it may be appropriate for an expert to testify about policies and procedures that a healthcare provider such as Wexford should have in place. For example, in *Springhill Hosps., Inc. v. West*, 388 So. 3d 648 (Ala. 2023), the Alabama Supreme Court ruled it was appropriate for a hospital medical director, who was an anesthesiologist, to testify "about the policies and procedures that hospitals should have in place to protect patients when opioids are prescribed and administered and the roles various hospital personnel – doctors, pharmacists, and nurses – play in ensuring patient safety with respect to opioid administration." *West*, 388 So. 3d at 658, 660–62. The Alabama Supreme Court reasoned that the medical director "was not testifying about a nurse's standard of care but, rather, about roles hospital

personnel play in ensuring patient safety when opioids are prescribed and administered by IV to patients." *West*, 388 So. 3d at 662. Here, Dr. Patterson has not purported to testify to deficiencies in the policies or training of Wexford; Dr. Patterson testified that individual Wexford employees failed to follow established policies and breached the standard of care in Mr. Abrams's case. Accordingly, Dr. Patterson is competent to testify about the care those employees provided only to the extent that he is "similarly situated" to them.

Ms. Abrams argues that Dr. Patterson is competent to testify against Wexford employees like Ms. Fox and Mr. Thomas because the nonspecialist provisions in ALA. CODE § 6-5-548(b) apply to the employees without medical degrees. (Doc. 157, pp. 5, 9–11). Wexford concedes that the nonspecialist provisions in ALA. CODE § 6-5-548(b), rather than the specialist provisions in ALA. CODE § 6-5-548(c) & (e), apply to Ms. Fox and Mr. Thomas. (Doc. 158, p. 4).

Alabama courts have interpreted the "similarly situated" requirement for nonspecialists narrowly. The Court has not located Alabama cases dealing with associate licensed mental health professionals or licensed medical social workers. Cases involving nurses provide some guidance. These cases indicate that a court may not consider an expert "trained and experienced in the same discipline or school of practice" merely because the expert may oversee persons with the defendants' qualifications. For example, in *Husby v. S. Alabama Nursing Home, Inc.*, 712 So.

2d 750 (Ala. 1998), the Alabama Supreme Court ruled that under ALA. CODE § 6-5-548(b), neither an anesthesiologist nor a nursing home administrator was competent to testify as to "the standard of care that a nurse would exercise in keeping a nursing home patient restrained to a bed" because neither was "trained or experienced in the area of 'hands on' nursing care," and the plaintiff "should have offered the testimony of a nurse trained in the daily care of patients." *Husby*, 712 So. 2d at 753. In *Springhill Hosps., Inc. v. Critopoulos*, 87 So. 3d 1178 (Ala. 2011), the Alabama Supreme Court ruled that under ALA. CODE § 6-5-548(b), a nurse who had substantial expertise in treating pressure ulcers but who lacked cardiac surgery aftercare experience was not competent to testify as to the standard of care for nurses treating pressure ulcers in a cardiac-artery-bypass graft recovery unit. *Critopoulos*, 87 So. 3d at 1187–89.

Dr. Patterson's qualifications are completely different from those of Ms. Fox and Mr. Thomas. Alabama courts sometimes recognize an exception for "highly qualified" individuals who do not strictly meet the requirements of ALA. CODE § 6-5-548, but those exceptions usually are individuals in the same general field. *Compare Dowdy v. Lewis*, 612 So. 2d 1149, 1151 (Ala. 1992) (allowing fulltime nursing instructors with decades of experience practicing and teaching the type of nursing at issue in the case, who possessed post-graduate degrees in nursing and "made it their business to determine what was on the 'cutting edge' of the profession

by continual study of the modern trends in nursing," to testify about nursing standard of care even though "neither expert had practiced in the same discipline as [the defendant nurse] during the year preceding the alleged breach of the standard of care"), *and HealthTrust, Inc. v. Cantrell*, 689 So. 2d 822, 826–827 (Ala. 1997) (allowing expert who was trained as an operating room technician, had extensive experience in operating rooms, held offices in the Association of Operating Room Nurses (which set safety standards), gave continuing education lectures on operating room safety, and had published in the field to testify as to standard of care for operating room technician despite not having practiced as an operating room technician for several years), *with King v. Corr. Med. Servs., Inc.*, 919 So. 2d 1186, 1193–96 (Ala. Civ. App. 2005) (declining to apply "highly qualified" exception to allow correctional health expert with extensive experience overseeing and improving healthcare in correctional systems, including serving as a federally appointed monitor for three jail systems, to testify as to the standard of care for internal medicine in a correctional health setting when the expert had not practiced hands-on medicine for several years). Dr. Patterson has not worked as a nurse. Because Dr. Patterson is not "trained and experienced in the same discipline or school of practice," ALA. CODE § 6-5-548(b), as the Wexford employees whose actions Ms. Abrams challenges, he is not competent to testify against them under Alabama law.

Even if Dr. Patterson were competent to testify as to the standard of care for Ms. Fox, Mr. Thomas, or similar individuals, the record does not support a finding of duty or proximate cause based on their actions alone. The record does not indicate that Ms. Fox or Mr. Thomas failed to convey information to Dr. Thrower and Dr. Gawronski. Dr. Thrower and Dr. Gawronski determined that it was appropriate to downgrade Mr. Abrams from acute to non-acute suicide watch and then to discharge him. Ms. Fox, Mr. Thomas, and other lower-level Wexford employees could not downgrade or discharge Mr. Abrams without the approval of a psychiatrist or psychologist like Dr. Thrower or Dr. Gawronski. (Doc. 118-3, pp. 3–4). As noted, Ms. Abrams cannot rely on Dr. Patterson's opinions to establish that Dr. Thrower or Dr. Gawronski's decisions were negligent, as she alleges. Therefore, Dr. Patterson's testimony does not help Ms. Abrams with respect to lower-level Wexford employees like Ms. Fox and Mr. Thomas.

As noted, Mr. Abrams was cleared for discharge on December 26, 2018, but remained in the infirmary until January 2, 2019, when a restrictive housing cell first became available. (Doc. 118-1, p. 15; Doc. 118-9, p. 46, tpp. 174–77; Doc. 118-4, p. 2). In the interim, on December 26, December 27, and January 2, Mr. Abrams denied suicidality and stated that he had claimed he was suicidal to get assistance in other matters. (Doc. 118-5, pp. 53–55, 60, 62–63). Mr. Abrams's medical records do not indicate that he behaved unusually between December 26 and his last contact

with Wexford on January 2. Wexford personnel's failure to conduct a formal three-day follow-up interview on December 29 or a formal segregation admission screening on January 2 may have been negligent, but on the evidentiary record in this case, given Mr. Abrams's statements between December 26 and January 2, Ms. Abrams has not linked that alleged negligence to Mr. Abrams's suicide. *See Glenn v. Corizon L.L.C.*, No. 21-10021, 2022 WL 1041338, at *4 (11th Cir. Apr. 7, 2022) (finding suicide was not foreseeable to nurse who failed to ask required questions when "it is wholly speculative that [the detainee] would have told [the nurse] that he was having suicidal feelings at 8:20 a.m. on September 11 even if she had asked those questions," and the nurse "did ask if [the detainee] had a statement and recorded that [the detainee] had 'No statement' to make").

Ms. Abrams argues that "Alabama negligence law does not require a plaintiff to isolate a single, exclusive proximate cause where multiple, independent breaches combine to produce a single indivisible harm; each may be found to be a legal cause of the resulting injury." (Doc. 157, p. 11) (citing Restatement (Second) of Torts § 431 cmt. a (1965)). True, there can be more than one but-for cause of an injury, but to hold Wexford liable, Ms. Abrams must show that conduct attributable to Wexford was a but-for cause of the harm. Ms. Abrams has not carried her burden of production.

Ms. Abrams cannot rely on the *Braggs* litigation as a substitute for expert testimony. Alabama's collateral estoppel rule applies to Ms. Abrams's state law claims. *See Taylor*, 553 U.S. at 891 n.4. The Alabama rule requires "an identity of interest in the subject matter of litigation" to apply collateral estoppel to a nonparty. *Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1273–74 (11th Cir. 2020) (citation omitted). As noted, ADOC and Wexford do not share an identity of interest in the *Braggs* litigation, so Ms. Abrams cannot assert collateral estoppel against Wexford. The legal and factual conclusions of the *Braggs* court are not otherwise admissible as evidence. As noted, Ms. Abrams has not placed the *Braggs* evidence in the record in this case.

Ms. Abrams argues that the *Braggs* injunctions and ADOC's administrative regulations establish the standard of care. (Doc. 157, p. 15). That may be true with respect to ADOC, but for the defendant healthcare providers, the AMLA establishes the standard of care, which "is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases." ALA. CODE 6-5-542(2). Dr. Patterson acknowledged that adequate mental healthcare may be provided without following all provisions of the *Braggs* orders. (Doc. 118-9, pp. 67–68, 71, tpp. 261–63, 276–77) (admitting that, as a general matter, "there's no magical number" of days later post-suicide-watch follow-up appointments must occur, and "it's possible to have

sufficient or reasonable mental health care without [the] three-day follow-up requirement" that the *Braggs* court imposed). Accordingly, Ms. Abrams may not rely on the *Braggs* orders to establish the standard of care for Wexford.

For the reasons discussed, the Court grants Wexford's motion for summary judgment.

***

Ms. Abrams's Eighth Amendment claim against Ms. Coe fails because it is undisputed that Ms. Coe had no knowledge of Mr. Abrams. (Doc. 115-1, pp. 3–4; Doc. 115-2, pp. 8–9, 16–17, tpp. 19, 25, 53–55). Ms. Abrams's wrongful death claim against Ms. Coe fails because Ms. Abrams has not provided evidence from which a reasonable juror could conclude Ms. Coe's actions caused Mr. Abrams's death. Ms. Coe performed an administrative role at Wexford; she was not involved in patient care. (Doc. 115-2, pp. 7–12, tpp. 14–35). To the extent Ms. Coe could be considered a policymaker, Dr. Patterson testified that he either did not review Wexford's policies and trainings or that he thought Wexford's policies and trainings were "solid." (Doc. 118-9, pp. 31–32, 43–44, 57, 62, 69, 76–78, tpp. 115–21, 165–66, 219–20, 239–40, 266–68, 297–98, 302–03). Dr. Patterson testified that he had no direct criticisms of Ms. Coe's actions. (Doc. 118-9, p. 77, tpp. 300–01). Accordingly, Ms. Coe is entitled to judgment as a matter of law on Ms. Abrams's wrongful death claim.

## IV.

For the reasons discussed above, the Court grants the remaining defendants' motions for summary judgment. The Court denies the ADOC officials' motion to exclude the testimony of Dr. Patterson as moot. The Court will TERM Docs. 113, 116, 120, and 122. The Court will enter a final judgment.

**DONE** and **ORDERED** this September 30, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE